BOSTWICK, Respondent, vs. THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, Appellant.

*February 24—March 11, 1902.*

*September 6, 1902—February 3, 1903.*

*Life insurance: Contracts: Fraud: Waiver: Presumption from sign-
ing written instrument: Failure to read: Ignorance of contents
of written instrument: Negligence: Acceptance of performance:
Reasonable time: Contributory negligence: Defenses: Construc-
tive notice: Rescission: Recovery of consideration: Laches:
Appeal and error: Actions tried by court: Practice: Mandate on
reversal.*

1. Plaintiff agreed for a policy of life insurance but received one
different from that contracted for. On receiving the policy he
threw it into a drawer in his desk, without examination, al-
though a casual glance at the policy and accompanying letter
would disclose that it was not the policy he expected. Several
months afterward, on discovery of the different character of the
policy, plaintiff for the first time objected, and brought action to
recover the premium paid. *Held*, that the fraud, if any, was
waived, and the policy accepted.

*On rehearing:* Syllabus by MARSHALL, J.:

2. A person who, in a business deal with another, signs a written in-
strument, is conclusively presumed, as to that other and all
persons claiming under him through such instrument, to know
the contents thereof, no fraud or deceit being used by such other
or by any one for whose conduct he is responsible, reasonably
calculated to and which does induce such person to become a
party to such instrument without reading it.

3. If a person, by the fraud of another, or of some one for whose
conduct he is responsible, becomes a party to a written instru-
ment without reading it or personally knowing the contents
thereof, he is not precluded thereby from obtaining judicial re-
dress in some form of action, for any injury which may be
thereby caused to him through such instrument not being what
he supposed it to be.

4. Mere ignorance of the contents of a paper by one who becomes a
party thereto under a mistake as to its import, will not enable
him to avoid his act.

5. The doctrine that a person is not inexcusably negligent in signing a paper in a business transaction with another, relying upon positive false statements on the part of that other or of some one for whose conduct he is responsible, as to its import, applies only where the deceit is practiced at the time, and in the transaction, of such signing.

6. If a person contracts with another for an article to be delivered or gives an order therefor, and thereafter a thing is delivered to him ostensibly in compliance with the order or fulfillment of the contract, unless, at the time thereof or within a reasonable time thereafter, he notifies such other that such article will not be accepted as satisfying the contract or order, he will be conclusively presumed to have waived all departures therein from the thing bargained for which are obvious to the senses by ordinary exercise thereof. This is subject to what follows.

7. The reasonable time mentioned in the foregoing rule commences to run from the time the person receiving the article has reasonable opportunity to observe its defects, unless the opposite party, by fraud or deceit, prevents such person from examining it or induces him not to do so; but such person cannot successfully refer merely to deception practiced upon him at the time of his giving the order or entering into the contract, to excuse failure to observe obvious departures in the thing delivered from that bargained for, at or within a reasonable time after the delivery.

8. Upon the reception of an article by a person under the circumstances stated in the two foregoing rules, nothing occurring then for which the opposite party is responsible, reasonably preventing him from using, or inducing him not to use, his senses so as to discover obvious departures therein from the thing bargained for, the rule applies that the law requires men, in their dealings with each other, to exercise proper diligence and apply their attention to those particulars which may be supposed to be within reach of their judgment, and not to close their eyes to means of information which are accessible to them. *Vigilantibus et non dormientibus jura subveniunt.*

9. The rule that contributory negligence is not a defense to an intentional wrong does not apply to a situation where negligence is so inexcusable as not to be really a contributing cause, but to be really a cause intervening between the wrong and the injury as the real producing cause thereof.

10. He who is inexcusably negligent in a business transaction forfeits the right to judicial remedies for relief, and not because of any favor or indulgence which the law extends to the wrongdoer, but because of failure on the part of the injured person to

exercise that care for his own protection which the policy of the
law requires as a condition of its protection, such policy being
to aid only those who exercise some reasonable care to guard
their own interests.

11. Negligence of a person in not asserting his right against an-
other by whom he has been defrauded in a business transaction,
is not a defense, strictly so called, to an action on the former's
part for redress, but is evidence of submission to or waiver of
the wrong, more or less strong according to the circumstances,
and may be conclusive evidence thereof; or, it may be so gross
as to forfeit such person's right to judicial redress; or, in con-
nection with some injury to the wrongdoer, it may operate to
estop such person from claiming redress for the wrong first in-
flicted.

12. If a person, in a business transaction with another, is deceived
by the latter to his injury, such person may rescind the trans-
action within a reasonable time after he discovers or has rea-
sonable opportunity to discover the fraud, constructive knowl-
edge thereof being just as effective as actual knowledge to set
the time for rescission running and to mark its limits.

13. If a person receives a policy of insurance ostensibly in response
to an application therefor, which he signed and parted with in
the belief, induced by the fraud of the agent taking the same,
that it called for a policy different from that which it called for
in fact, he is bound as a matter of law to examine the policy
within a reasonable time after it comes to his hand, and to dis-
cover obvious departures therein from the one which he sup-
posed he was to get, and promptly, upon discovering the same,
to rescind the transaction, give the company due notice thereof,
and do all on his part which justice requires to restore the
former situation, or he will be held to have accepted the policy
as satisfying his application, so as to be precluded from rescind-
ing the same.

14. The reasonable time, for discovering that the policy differs from
the one supposed to have been applied for in the circumstances
stated in the foregoing rule, commences to run immediately
upon the reception of the paper, nothing occurring then to rea-
sonably excuse the applicant for omitting to examine his con-
tract. In such circumstances four and one half months' delay
in discovering the fraud and exercising the right of rescission
is, as a matter of law, too long a time.

15. If, in the situation stated in the last foregoing paragraph, the
element be added of the applicant for insurance being fraud-
ulently deterred from examining his policy by something occur-
ring at the time of the delivery thereof to him, four and one half

months' delay in discovering the fraud is not, as a matter of law, so long as to forfeit the right of rescission.

16. The existence of a cause of action at law to recover the consideration parted with upon a contract, on the ground of fraud, presupposes the actual termination of the contract because of the fraud, and that requires a repudiation of such contract by the insured person *in toto*, or so far as justice may require, and an unconditional offer on his part, so far as justice may require, to restore the wrongdoer to his former situation, or a waiver of such offer by such conduct on the latter's part as to clearly indicate that a tender to him of that which he parted with in the transaction would be useless because he would not accept it.

17. If a judgment in an equity case or an action at law tried by the court be reversed on appeal to this court, and there is an unsolved question of fact that must be determined before final judgment can be rendered, and there are conflicting reasonable inferences as to how such issue should be solved, rendering it doubtful which way is the right of the matter, lest injustice may be done by the exercise of jurisdiction to decide the issue here as an original matter, the court will remand the cause to the trial court to determine such issue and then to apply the law to the case as directed.

CASSODAY, C. J., dissents.

APPEAL from a judgment of the circuit court for Rock county: B. F. DUNWIDDIE, Circuit Judge. *Reversed.*

Action to recover money paid to defendant for three insurance policies. Plaintiff claimed that George S. Parker,. Arthur H. Barrington and himself were each fraudulently induced to sign an application for an insurance policy of a different character than he intended; that each, as soon as he discovered the fraud, repudiated the transaction; and that Parker and Barrington thereafter, and before the commencement of this action, assigned to plaintiff their claims for the return of the money paid to the defendant. The answer put in issue all the allegations constituting the alleged fraud. There was evidence tending to show that defendant's agent and plaintiff negotiated, from time to time for several days, in respect to the latter taking a $10,000 policy of life insurance in the defendant company; that the agent strongly recommended what he called a "five per cent. debenture

policy"; that plaintiff, from first to last, insisted that he did not want a policy that could not be paid up in ten years; that he would take a ten-payment policy and no other—one that would be fully paid in ten years; that the agent, from first to last, continued to recommend a five per cent. debenture policy, but did not say that such policy would require annual payments for life; that finally the agent said he would obtain for plaintiff what the latter wanted, and made out an application, representing that it was in accordance with the latter's wishes; that plaintiff had the paper in his possession for a considerable length of time and had ample opportunity to read and understand it, but did not do so, relying entirely upon the belief that the agent had written it in accordance with the understanding which had been reached; that the policy was received about April 1, 1897, accompanied by a letter, the opening lines of which were to the effect that it was a five per cent. debenture annual premium payment policy, such as the agent had urged plaintiff to take; that the letter further explained that the payment upon the policy would be $2 less per year than had been talked, and that $2 had been credited to plaintiff because he had given his paper for $1,064 when $1,062 was the proper amount; that when plaintiff received the policy he threw it into his drawer and did not examine it or pay any attention to it to discover whether it was according to his understanding or not; that circumstances led him to examine the policy sometime thereafter, and that about August 22, 1897, he discovered that it was entirely different from the policy he was to obtain; that he thereupon notified defendant's agent of such fact and demanded an explanation; that considerable correspondence was subsequently had between plaintiff and the agent, resulting in an absolute repudiation of the policy by plaintiff on March 19, 1898. The evidence tended to show that Parker desired the agent to obtain for him a twenty-payment policy; that he signed an application without reading it, supposing the agent had writ-

ten it according to his request; that when his policy came he put it away without reading it and did not examine the paper or discover that it was not in accordance with his understanding, till about five months after it was received; that he then rescinded the insurance contract as far as it was possible for him to do so. The testimony as to Barrington was substantially the same. The evidence on the part of defendant was to the effect that the several applications for insurance were made in accordance with the understanding between the applicants and the agent and that the policies were issued accordingly. The court decided that the application made by plaintiff was written by the agent and signed by plaintiff without his reading it, though he was perfectly competent to do so and to understand it, and that he had ample opportunity therefor; that the reason why he did not do so was because he relied upon the agent to write it in accordance with his request; that plaintiff desired the agent to write the application for a ten-year annual payment policy, which he agreed to do; that he received the policy about April 1, 1897; that it was an annual premium policy, but that he did not discover that fact till August 22, 1897; that within a reasonable length of time thereafter he tendered the policy back to defendant and demanded a restoration of his money and notes. The circumstances as to Parker and Barrington are of the same character. Before the commencement of this action they assigned their claims for restitution to plaintiff. The conclusion of law reached was that plaintiff was entitled to recover of the defendant the money paid on the several policies, aggregating $1,401.50, with interest upon each such payment from the time it was made with costs. Judgment was rendered accordingly.

For the appellant there was a brief by *Fethers, Jeffris & Mouat,* and oral argument by *M. G. Jeffris.*

For the respondent there were briefs by *Ruger & Ruger,* and oral argument by *Wm. Ruger.*

The following opinion was filed March 11, 1902:

MARSHALL, J.    Two propositions are presented for consideration: First, were the applicants for insurance bound by their applications because of their failure to know what they signed?    Second, did the retention of the policies by the applicants for several months, without objection, constitute an acceptance thereof and waive the fraud, if there was fraud, in securing the applications?    The learned counsel for respondent devoted nearly all their printed argument, as they did nearly all their oral argument, to the first proposition. As we do not think it is necessarily decisive of the case, we shall assume that in deciding it the trial court did not err. On the second proposition the court held that the applicants did not accept the policies because they repudiated them within a reasonable time after knowing that the instruments were not what they supposed their applications called for; that the mere retention of the policies without such knowledge did not constitute an acceptance. Appellant's counsel contend that when the policies were received the applicants were, as ordinarily prudent persons, put upon inquiry as to the character thereof, that they should have examined the policies, and that their failure to do so, and retention thereof for several months before making any complaint, was an acceptance of them as fulfilling the applications as they supposed such applications were made, and a waiver of fraud, if there was fraud, in obtaining the same.

As we view the turning question above suggested, the law has been firmly settled in favor of appellant, and has been applied by this court in many cases.    It does not militate, as counsel for respondent seem to think, against the maxim that a person cannot take advantage of his own wrong, but enforces that other one, which is quite as well established, that the court will not constitute itself the guardian of persons of mature age and ordinary intelligence, protecting them against

the results of their own negligence; that it will not furnish a
person a remedy for a wrong where he cannot prove a legal
claim for damages without showing that his own negligence
intervened between the act of the alleged wrongdoer and the
result complained of, and was the real, efficient, producing
cause of his injury; that in such a case it will be conclusively
presumed that he voluntarily accepted the situation, because,
if he had used ordinary care, the injury complained of would
have been prevented. Applying that in the decision of the
cases, it has been repeatedly held that if a person contracts
for an article to be delivered, and delivery is made ostensibly
in fulfillment of the contract, under such circumstances that
he has ample opportunity to test the thing delivered by the
contract, he is put upon inquiry as to all departures there-
from which are open and obvious to ordinary inspection;
that he is bound to see those things which are plainly observ-
able and is charged with knowledge thereof from the time
he ought, in the exercise of ordinary care, to have discovered
them; and that if he does not, within a reasonable time there-
after, give notice that the thing delivered is not accepted
as satisfying the agreement to purchase, he will be deemed
to have accepted it and waived obvious departures from the
agreement if there are such. Counsel for respondent vig-
orously attack that doctrine, but it is too firmly intrenched
in our jurisprudence, and in the law generally, to be open to
question.

The first case in which the principle above stated is dis-
tinctly declared in the decisions of this court is *Locke v. Will-
iamson,* 40 Wis. 377. The court there said:

"We have concluded to hold this rule in respect to an ex-
ecutory contract: that when the defects in the goods are
patent and obvious to the senses, when the purchaser has a
full opportunity for examination, and knows of such defects,
he must, either when he receives the goods or within what
under the circumstances is a reasonable time thereafter, no-
tify the seller that the goods are not accepted as fulfilling the
warranty; otherwise the defects will be deemed waived."

In subsequent cases that rule was considerably expanded in accordance with the current of authority, to the effect that reasonable opportunity for obtaining knowledge is equivalent to knowledge, as the following citations will show. In *Mamlock v. Fairbanks,* 46 Wis. 415, 1 N. W. 167, it was said that present means of knowledge must be considered; that the doctrine that one must observe what he has reasonable opportunity for knowing in matters of contract is within the rule of *caveat emptor;* that the law for the protection of persons against fraud will not be extended to those who, "having the means in their own hand, neglect to protect themselves;" that "the law requires men, in their dealings with each other, to exercise proper vigilance, and apply their attention to those particulars which may be supposed to be within reach of their observation and judgment, and not close their eyes to the means of information which are accessible to them." *"Vigilantibus non dormientibus jura subveniunt."* In *Warner v. Benjamin,* 89 Wis. 290, 62 N. W. 179, it was held that, if a person is put upon inquiry in respect to the quality of a thing offered for sale to him, he is bound to know what is discoverable in regard thereto by the exercise of ordinary care; that he cannot "close his eyes to defects which are before him or to the information which is at hand." In *Farr v. Peterson,* 91 Wis. 182, 64 N. W. 863, it was held that, 'if the defects in the subject-matter of the contract are patent and should be discerned by the exercise of ordinary diligence, the purchaser is bound to discover them at his peril; that in dealings between individuals each is bound to apply his attention reasonably to the subject-matter thereof and to discover those things which are within reach of ordinary observation and judgment, and which they are not prevented from discovering by artifice or fraud.' Again, in *Thompson Mfg. Co. v. Gunderson,* 106 Wis. 449, 453, 82 N. W. 299, it was held that if an article is delivered in fulfilment of an executory contract, and the receiver thereof has full opportunity for

examining the same and observing variations therein from
the article contracted for, and fails within a reasonable time
to give notice that the article is not accepted as fulfilling the
contract, the variances, if any, will be deemed waived.

It is easy to apply the foregoing to the facts of this case.
The applicants for insurance had ample opportunity to ex-
amine their policies when the same were received.   It was
their duty to do that.   An examination of the policies, even
of a casual character, would have revealed all the material
facts.   The applicants did nothing by way of examining the
papers for months after receiving them, during all of which
time the defendant carried the risks it had assumed.   What
appears to counsel for respondent to be want of harmony in
the authorities, in respect to such a situation, in the main,
grows out of failure to take in the full scope of the rule that
every person must use reasonable diligence for his own pro-
tection, or in confusing it with other rules with which it does
not conflict.   Counsel errs most grievously in the idea ad-
vanced, that negligence is never a defense in a case grounded
on fraud against the wrong-doer, as the cases above cited
amply show, though it is true that there are expressions in
legal opinions that may be referred to in justification of the
error, and later we will refer to an instance of that kind in
our own decisions, and probably there are others.   However,
on a question so well settled, contrary statements in opinions,
used *arguendo,* ought not, it would seem, to lead one astray.
In 14 Am. & Eng. Ency. of Law (2d ed.) 115–117, the rule
stated is supported by citations from English decisions, and
from most of the states of the Union.   The author says:

"This doctrine is not based upon any consideration for the
party who has been guilty of the false representations, but
upon the ground that public policy requires that persons shall
be required to exercise at least ordinary prudence in their
dealings, instead of calling upon the court to relieve them
from the consequences of their inattention and negligence."

Counsel for respondent cite to our attention cases to the effect that the time for a person who receives property upon an executory contract, or who is defrauded in the making of a contract, to rescind the transaction, does not begin to run till he has knowledge of the facts. That is true, but, as we have seen, the rule does not require actual knowledge; constructive knowledge is just as efficient as actual knowledge. A person is presumed to know those things which reasonable diligence on his part would bring to his attention. If he accepts the article furnished without exercising that diligence, he does so at his peril. In that sense the maxim *caveat emptor* applies, as said in *Mamlock v. Fairbanks, supra.* The observation in *Beetle v. Anderson,* 98 Wis. 5, 73 N. W. 560, that "the rule *caveat emptor* has no application to cases of fraud," as it might be understood, is wrong. The idea which the court intended to convey is that, where a person is so circumstanced that he may, consistently with reasonable care, rely upon the representations of the person with whom he is contracting, the rule *caveat emptor* does not apply. That is, where the fraud complained of is actually produced by the wrongful conduct of the defendant, he cannot invoke the doctrine of *caveat emptor* to protect himself from the consequences thereof. But a person acts at the peril of suffering the consequences in relying upon the representations of another with whom he is contracting if the exercise of reasonable care would uncover to him the truth. Cases are cited to the effect that a person cannot profit by his own wrong. That is true as a general proposition, but it is just as true, as we have seen, that a person cannot have the protection of the law where he fails to use reasonable care to protect himself. When it is said that a person cannot take advantage of his own wrong, it is meant that he cannot do so as against a person who is injured by that wrong. The mere fact that one person relies upon false representations made by another to his injury does not constitute a cause of action against such

other. There must be a further circumstance. Such person must be induced to rely upon the fraudulent representations, and that circumstance does not exist where such person would not be so induced but for his own heedlessness.

The rule we have discussed has been applied elsewhere generally, and in many cases quite similar to the one before us, some of the more important of which are cited in the brief of counsel for appellant. In *New York Life Ins. Co. v. McMaster,* 87 Fed. 63, it was held that where a person receives an insurance policy pursuant to an application it is his duty to examine it and see those things in respect thereto which are open to ordinary observation by a person of ordinary intelligence, and that if he neglects to do so, taking it for granted that he has received what he applied for or intended to apply for, he is guilty of inexcusable negligence and in law his conduct amounts to an acceptance of the policy received regardless of whether it corresponds to the policy applied for or intended to have been applied for or not; that representations made by an insurance agent at the time of the application for a policy of insurance is made constitute no excuse for failure of the applicant to look at his policy when it is delivered to him, to see if it corresponds to the one expected, and to discover the facts in that regard if that can be done by a reasonable examination of the paper; that if one fails to read his contract under such circumstances, having full opportunity for doing so and ability to read, he is guilty of gross negligence and cannot be heard successfully to say that he kept it in ignorance of its character; that the rule in that regard applies to all contracts, insurance contracts being no exception. In *Fennell v. Zimmerman,* 96 Va. 197, 31 S. E. 22, it was held that it is the duty of a person, on receipt of an insurance policy pursuant to his application, to examine it; that he commences receiving benefits immediately upon the policy coming to his hand, and that it is his duty to examine the paper upon its receipt and to return it within a reasonable,

time if it is not satisfactory, and that a failure to do so is in law an acceptance of the policy. In *McMaster v. New York Life Ins. Co.* 99 Fed. 856, cited by counsel for respondent, the doctrine in the previous case, regarding the same policy (*New York Life Ins. Co. v. McMasters,* 87 Fed. 63), was discussed at length, and it was said to apply both at law and in equity. There are many cases of like character, which might be referred to, but the principle upon which they rest is so universally recognized that we shall omit further reference to cases, except to cite *American Ins. Co. v. Neiberger,* 74 Mo. 167, as an indication of the current of authority as regards the length of time held by courts to constitute ratification of a policy not issued according to the representations of the agent, where no objection is made in that regard within a reasonable time after the assured has had a fair opportunity to read and understand it. In that case no objection was made for about three months, and it was held that the delay constituted an acceptance of the policy.

In this case the representations made to the applicants for insurance in no way prevented them from examining the policies when they were received. It was their duty to make such examination. Had they performed that duty they would have easily discovered all that they complain of. The opening lines of the letter sent appellant with his policy told the whole story. A casual glance at it would have informed him that the policy was not such as he expected to receive. Certainly he cannot, under any rule, be excused for omitting to read the first three lines of a letter addressed to him on so important a business matter, which contained other information of interest to him than that with reference to the character of his policy, viz., information in regard to the amount of his annual payment. All the parties were insured for months before appellant had any intimation that the policies were not satisfactory. It cannot be doubted that, if death had come to any of them in that period, his policy would have

been enforced. Under those circumstances the applicants for insurance must be presumed to have accepted their policies long before their attempted rescission thereof and demand for the payment of the money paid thereon. The trial court and the learned counsel for respondent fell into a grievous error in supposing that the omission by the policy holders to look at their policies can be justified by what occurred at the time the applications for insurance were made, and that as against a party charged with fraud in the making of an executory contract the injured party was not bound to object in order to preserve his rights, till he has actual knowledge; that negligence on his part in failing to make the discovery is not to be considered. The law is otherwise, as we have seen. It seems perfectly clear that plaintiff entirely failed to establish any cause of action against the defendant, and that the complaint should have been dismissed.

*By the Court.*—The judgment of the circuit court is reversed and the cause remanded with directions to render judgment in favor of defendant for costs.

On June 19, 1902, a motion by the respondent for a rehearing was granted.

For the appellant there was a brief by *Fethers, Jeffris & Mouat,* and oral argument by *M. G. Jeffris.*

For the respondent there was a brief by *Ruger & Ruger,* and oral argument by *Wm. Ruger.* They contended, *inter alia,* that there was no negligence in plaintiff's failing to read the applications and policies; that the plaintiff did not, either at the time of signing the application or after receipt of the policy, owe to the defendant any duty requiring him to suspect that its representations were false, and take precautions accordingly by reading the application before signing, or the policy when received; that the defendant is estopped from imputing negligence because of plaintiff's reliance upon its representations; that mere negligence in failing to guard

against injury is not a defense in favor of a party intention-
ally inflicting it, through false representations, or other wrong
doing involving evil motive; imprudence or carelessness is
not necessarily negligence in contemplation of law. *Dowd v.
C., M. & St. P. R. Co.* 84 Wis. 105, 115; *Groth v. Thomann,*
110 Wis. 488, 496; 16 Am. & Eng. Ency. of Law, 466, 468,
469, 472; Shearman & Redfield, Negligence, §§ 1, 5; 1
Thompson, Commentaries on Negligence (2d ed.) §§ 1, 3,
192, 193; *Klix v. Nieman,* 68 Wis. 271; *Zieman v. Kieck-
hefer E. M. Co.* 90 Wis. 497; *Peake v. Buell,* 90 Wis. 515;
*Kellogg v. C. & N. W. R. Co.* 26 Wis. 223, 255; *McClellan v.
Scott,* 24 Wis. 86, 87; Broom's Legal Maxims, 228; Whar-
ton, Negligence, § 131; *Terre Haute & I. R. Co. v. Graham,*
95 Ind. 293; *Strohn v. D. & M. R. Co.* 21 Wis. 554, 561;
*Birdsey v. Butterfield,* 34 Wis. 52; *Warder, B. & G. Co. v.
Whitish,* 77 Wis. 433, 434; *Barndt v. Frederick,* 78 Wis. 11;
*Beetle v. Anderson,* 98 Wis. 5, 8, 9; *McCarty v. N. Y. Life
Ins. Co.* 74 Minn. 530, 77 N. W. 426, 428; *Palmer v. Hart-
ford Ins. Co.* 54 Conn. 509, 510; *Fireman's Fund Ins. Co. v.
Norwood,* 69 Fed. 77; *Hay v. Star F. Ins. Co.* 77 N. Y. 235;
*McElroy v. British Am. A. Co.* 94 Fed. 1000; *Kansas, M. O.
& M. Mut. Ins. Co. v. Central Nat. Bank,* 60 Kan. 630, 57
Pac. 527; *Equitable Safety Ins. Co. v. Hearne,* 20 Wall.
494; *McMaster v. N. Y. Life Ins. Co.* 99 Fed. 856; *Duffield
v. E. T. Barnum W. & I. Works,* 64 Mich. 293, 31 N. W.
314; *Nat. Bank of Dakota v. Taylor,* 5 S. Dak. 99, 58 N. W.
299; *Baker v. Lever,* 67 N. Y. 309; *Fargo G. & C. Co. v.
Fargo G. & E. Co.* 4 N. Dak. 219, 59 N. W. 1067; *Strand v.
Griffith,* 97 Fed. 856; *Erickson v. Fisher,* 51 Minn. 300, 53
N. W. 638; *Stanley v. M'Gauran,* L. R. 11 Ir. 331, 334,
343; *Hale v. Philbrick,* 42 Ia. 83; *C. Aultman & Co. v.
Olson,* 34 Minn. 450, 26 N. W. 451; *Bennett v. Mass. Mut.
Life Ins. Co.* 107 Tenn. 371, 64 S. W. 760. The doctrine of
constructive notice is equitable and cannot be invoked for the
purpose of allowing a party guilty of fraud to profit thereby;

it will serve equity but not inequity. 21 Am. & Eng. Ency. of Law (2d ed.) 585, 590, 684; *Kilbourn v. Sunderland,* 130 U. S. 518, 519; *Stanley v. M'Gauran,* L. R. 11 Ir. 331, 334, 343; *Converse v. Blumrich,* 14 Mich. 109; *Groton Sav. Bank v. Batty,* 30 N. J. Eq. 131; *Gill v. Hardin,* 48 Ark. 412; *Wild v. Gibson,* 1 House Lords Cas. 623; Kerr, Fraud & M. 80; *Cordova v. Hood,* 17 Wall. 8; *Hopkins v. Langton,* 30 Wis. 379, 381, 382; *Brinkman v. Jones,* 44 Wis. 519; . *Dutchess Co. M. Ins. Co. v. Hachfield,* 73 N. Y. 226, 228; 1 Thompson, Commentaries on Negligence, sec. 846. The doctrines of laches, acquiescence and waiver have the same purpose of serving equity as the doctrine of constructive notice, and largely the same elements and scope of application; it is essential to a waiver of a right by plaintiff that there be facts sufficient to create, in favor of the defendant, an equitable estoppel to assert the right. 18 Am. & Eng. Ency. of Law, (2d ed.) 97, 99, 101–103, 111, 115; 28 Am. & Eng. Ency. of Law, 526; *Ripley v. Ætna Ins. Co.* 30 N. Y. 136, 164; *Ross v. Swan,* 7 Lea (Tenn.) 467; *Deihl v. Adams Co. Mut. Ins. Co.* 98 Am. Dec. 307; *Pence v. Langdon,* 99 U. S. 581; *Ellis v. S. W. L. Co.* 102 Wis. 407; *Tarkington v. Purvis,* 128 Ind. 182, 25 N. E. 880; *Bennecke v. Conn. Mut. L. Ins. Co.* 105 U. S. 359. The plaintiff was never insured; the sending to him of a policy he never applied for, and his retention of the same in ignorance of its character, did not operate to make it even a voidable contract,—it was absolutely void. *Strohn v. D. & M. R. Co.* 21 Wis. 561; *Walker v. Ebert,* 29 Wis. 194; *Blaeser v. Milwaukee M. M. Ins. Co.* 37 Wis. 31, 40; *Aultman v. Olson,* 34 Minn. 450; Bishop, Contracts, sec. 646–8, 671. A person cannot raise an equity in his own favor by his own wrong doing. *Guckenheimer v. Angevine,* 81 N. Y. 397; *Neblett v. Macfarland,* 92 U. S. 105; *Dunn v. Amos,* 14 Wis. 115; *Honzik v. Delaglise,* 65 Wis. 500, 501; *Titus v. Glens Falls Ins. Co.* 81 N. Y. 419; *Bidwell v. Astor M. Ins. Co.* 16 N. Y. 266; *Hamlin v. Sears,* 82

N. Y. 331; *Girod v. Michoud,* 4 How. 503, 561; *Conn. Gen. L. Ins. Co. v. Eldredge,* 102 U. S. 245; *Gay v. Havermale,* 27 Wash. 390, 67 Pac. 806; *Hendrickson v. Hendrickson,* 51 Iowa, 68, 50 N. W. 287; *Directors C. R. Co. of V. v. Kisch,* 2 Eng. & Ir. App. 120; *Redgrave v. Hurd,* L. R. 20 Ch. Div. 13.

The following opinion was filed November 11, 1902:

MARSHALL, J.   A rehearing having been had in this case, we have examined the questions involved with this result: We are satisfied the law was correctly laid down in the former decision, though it is considered that the same was not in all respects correctly applied to the facts.   If we should attempt to write an opinion discussing at length all the propositions advanced in defense of the judgment appealed from, reviewing each of the multitude of authorities cited in support thereof, eliminating in detail those believed not to be in point as to any proposition legitimately in the case, harmonizing those which are correctly decided, and pointing out the errors of expression therein, and such errors and decisions in the others, we are fearful the result would be an opinion of such great length that in so attempting to light a clear way through the mass of things to which our attention has been called, the law, though correctly stated, would not be so clearly declared as to enable trial courts and the profession to easily understand the position of this court by which they are to be guided in future cases involving the same questions.   The ground required to be explored to that end, if we were to take the course indicated, would be so extensive that the essential principle finally elucidated would after all be in a measure obscured to one who, from necessity or otherwise, must act from a quick view of things, and the result would be mistakes in the application of the law.   Desiring, however, to leave nothing untouched that might in any event give rise to a thought on the part of counsel who with much labor presented the

case for consideration, that material matters have been over-looked, we will endeavor to cover all the important contentions urged upon our notice, supplementing briefly, as seems practicable, what was formerly said on some points, and discussing others so far as seems necessary to show the infirmity of counsel's reasons for a different decision as to the law, and wherein and why we have concluded to apply the same to the facts with a somewhat different result than at first decided upon.

A brief restatement of the facts seems appropriate to the end that the change decided upon from the previous result, may be better understood. We treat the facts as found by the court as verities, and add such undisputed matters on the evidence, not mentioned specifically in the findings, as are of importance.

Appellant's agent induced respondent to sign an application for a $10,000 policy of life insurance by representing to him that it called for one that would be fully paid for in ten annual payments of a specified amount. He signed and parted with such application, relying on the truth of such representations. During the negotiations between respondent and appellant's agent, resulting as stated, the latter urged the former to take out what he called a five per cent. debenture policy, while respondent insisted from first to last that he wanted and would purchase only a contract that would be fully performed on his part by ten annual payments. In due time a policy was sent to respondent by mail, ostensibly responsive to his application, accompanied by a letter from appellant's agent to the effect that it was a five per cent. debenture policy issued pursuant to the application. Respondent put the policy away among his papers without making any examination thereof, relying upon its being what the agent assured him the application called for. He gave cash and notes therefor to the amount of $1,062 for the first premium, which notes he subsequently paid. About four and one-half

months after receiving the policy he examined it for the first time, and then easily and at once discovered that it was an annual payment life policy, requiring him to pay $1,062 each year during his life. He immediately made complaint to appellant's managing agent in respect to the matter, expressing dissatisfaction, and making known that he wanted a different policy, one such as he bargained for. He continued negotiations for several months, endeavoring to have appellant give him what he supposed his application called for, ending with his becoming convinced that no satisfaction would be given him, whereupon, and about eleven months after the policy was received, he wholly rejected it.

One George H. Parker applied to appellant for a $5,000 policy of life insurance under circumstances similar in all respects to those characterizing respondent's application, except the one Parker supposed he was to obtain was a twenty annual payment life contract. In due time a policy was delivered to him by mail, accompanied by a letter, not stating anything to the effect that it was pursuant to or in accordance with his application. He gave cash and notes to the amount of $144 for the first premium, which notes he afterwards paid. He examined the policy for the first time about four months after its receipt, readily and at once discovering that it was an annual payment life policy instead of one such as he supposed his application called for. A few days thereafter he notified appellant's managing agent that he had been deceived into applying for, receiving and keeping a policy different from the one he desired, tendered the policy back, and demanded to be restored to his former position by a refunding to him of all that he had given for the policy except a proportionate amount of the premium to cover the time his life had been insured, which demand was refused.

Arthur H. Barrington, under circumstances similar to those last detailed, applied to appellant for a policy of life insurance, supposing he was to obtain a twenty annual pay-

ment life contract.   His application in fact called for an annual payment life contract.   In due time he received such a policy, accompanied by a letter not stating anything to the effect that it was in accordance with the application.   He gave his note for the first premium, amounting to $195.50, which he afterwards paid.   About five months after receiving the policy he examined it for the first time, immediately and readily discovering that it was not what he supposed he was to get.   A few days thereafter he notified appellant's managing agent of the facts, tendered back the policy, and demanded to be restored to his former position, which was refused.

There was nothing in either instance misleading the applicant into receiving and retaining his policy as stated, other than what occurred at the time the application was made, except, in respondent's case, the circumstance of the assurance, in the letter accompanying the policy, that it was the one applied for.

Parker and Barrington severally assigned their right against appellant to respondent before this action was commenced.   The court held that in each case, by artifice and fraud of appellant's agent, the assured signed his application for a policy, supposing it to call for one different from that actually sent in response thereto; that by reason thereof the applicant was not estopped from rescinding the transaction with appellant if, before the expiration of a reasonable length of time after he obtained actual knowledge of the facts, he made his election in the matter; that he acted in that regard within such reasonable time, and that respondent was therefore entitled to recover as to each of the causes of action sued on.

If this decision depends wholly on whether the applicants for insurance were estopped from rescinding the policies, by signing the applications therefor, they would be entitled to the relief granted by the circuit court.   It is elementary that

a person of mature age and sound mind, who, in his dealings with another, deliberately signs a written instrument, is conclusively presumed, as to that other and all persons claiming under him, to know and consent to what the paper contains, no fraud or deceit being used by such other or in his behalf at the time of such signing or efficiently reaching thereto, reasonably calculated to and which does induce such other to become a party to the instrument without reading it, and there being no mutual mistake. It is just as well settled that where there is such fraud or deceit, such person is not guilty of such unreasonable conduct, in relying upon the honesty of such other and signing the paper without reading it or knowing its contents, as to preclude him from obtaining judicial redress in some form for the wrong, if he is injuriously affected by the instrument not being what such other's wrongful conduct induced him to understand was its import, and if he acts in the matter before the intervention of some other element legally efficient to render such wrong without remedy. Of course, mere ignorance by a person of the contents of a paper which he signs cannot avail him to avoid it. True, there are decisions which do not clearly recognize that. Some of them counsel for respondent point to as excusing the applicants here, both in not knowing the contents of their applications and in not knowing the character of the policies received in response thereto till months after their receipt. *Butler v. Regents,* 32 Wis. 124; *Schultz v. C. & N. W. R. Co.* 44 Wis. 638. So far as such authorities are referred to to show that mere ignorance on the part of the applicants for insurance, of the contents of their applications, is sufficient to rebut the legal presumption that such applications were signed and parted with by them with knowledge of the contents thereof, and that the written evidence may be impeached by oral evidence of the actual bargain made at the time the applications were signed, they are not in point, because the court found the element of fraud reasonably calculated to induce the appli-

cants to sign the papers in ignorance of their contents. So far as they are referred to to excuse the applicants on the ground of mere ignorance, for receiving and keeping the policies for months without objection, they have been discredited by more recent decisions of the court. *Prince v. Overholser,* 75 Wis. 646, 44 N. W. 775; *German Bank v. Muth,* 96 Wis. 344, 71 N. W. 361; *Jackowski v. Illinois Steel Co.* 103 Wis. 448, 79 N. W. 757; *Straker v. Phenix Ins. Co.* 101 Wis. 413, 77 N. W. 752; *McGowan v. Supreme Court I. O. F.* 107 Wis. 462, 83 N. W. 775; *Deering v. Hoeft,* 111 Wis. 339, 87 N. W. 298. It follows that no further attention need be paid to the question of whether the applicants were precluded from rescinding their policies upon the ground that they might, had they seen fit to use the means in their hands at the time of such signing, have known the kind of policies they were to receive. The maxim, *"Vigilantibus, et non dormientibus, servat lex"* (the law assists those who watch and not those who sleep), does not apply to a business transaction as between parties thereto where one omits to investigate, relying on assurances by the other as to the facts, made at the time of entering into the transaction, such as signing and parting with a paper by one relying on representations as to its contents by the opposite party thereto. *Schultz v. C. & N. W. R. Co.* 44 Wis. 638; *Brooks v. Matlhews,* 78 Ga. 739, 3 S. E. 627; *Wenzel v. Shulz,* 78 Cal. 221, 20 Pac. 404.

Counsel vigorously urges receding from the former decision to the effect that it is negligence for a person to omit to examine his policy of insurance as soon as reasonable opportunity therefor is afforded, relying on assurances made by the company's agent at the time he took the application, as to the kind of policy it called for. We must adhere to our former conclusion on that point, notwithstanding the decisions confidently relied on by counsel to show that it is in conflict with other decisions of this court and authorities elsewhere. We believe the former decision is right on principle, is well sup-

ported by authorities cited in the opinion, and is in strict accordance with the doctrine of the supreme court of the United States on the subject, as we shall show before closing what we have to say. If it were clear that there was any conflict of authority to be dealt with, as claimed by counsel for respondent, since the doctrine involved is within the spirit if not the letter of *Mamlock v. Fairbanks,* 46 Wis. 416, 1 N. W. 167; *Locke v. Williamson,* 40 Wis. 377; *Warner v. Benjamin,* 89 Wis. 290, 62 N. W. 179, and *Farr v. Peterson,* 91 Wis. 182, 64 N. W. 863, and not contrary to any other case in this court when rightly understood, we should not hesitate to be guided, if assistance were necessary, by the decisions of the supreme court of the United States rather than to depart from the settled position here, which has not been disturbed since proclaimed clearly in the *Mamlock Case.* Nearly all the authorities which counsel for respondent rely upon relate to where the complaining party was lulled into security by something said or done by the wrongdoer at the time of the particular transaction complained of. Under those circumstances it is rightly held that such person is not inexcusably negligent. The following are samples of the authorities referred to: *Warder, Bushnell & Glessner Co. v. Whitish,* 77 Wis. 433, 434, 46 N. W. 540, where the rule in *Mamlock v. Fairbanks,* was inferentially affirmed. The injured person, by false representations made at the time, was induced to sign a paper, which was immediately taken away by the wrongdoer. The court said:

"This is not the case of a party, in the absence of fraud or mistake, failing to know the contents of a written instrument signed by himself by reason of his own negligence or want of reasonable care, as . . . *Herbst v. Lowe,* 65 Wis. 316, 26 N. W. 751. . . . Certainly no one will contend that a person can procure the signature of a party to a contract by false representations, and then enforce the contract on the ground that, had the party so deceived been more vigilant, he would have discovered the fraud in time to have withheld his

signature from the contract. In other words, a person cannot procure a contract in his favor by fraud, and then bar a defense to it on the ground that had not the other party been so ignorant or negligent he could not have succeeded in deceiving him."

That clearly shows that the court did not have in mind the action of a person in accepting an article in fulfillment of an order therefor, nothing being then done to prevent or deter such person from seeing obvious departures from the thing bargained for. The distinction between the two classes of cases has not always been carefully pointed out in legal opinions, and not always recognized, leading to expressions therein quite liable to cause one to go astray if he does not keep in mind the philosophy of the rule that *caveat emptor* applies when no deceit is exercised to reasonably excuse a person from dealing at arm's length, and not when there is such deceit; and therefore, while it may not apply to estop a person from successfully complaining of a transaction on account of what occurred at the time of entering into it, it may as to electing whether to abide by the transaction if he is inexcusably negligent in the matter. Those distinctions are accurately pointed out in the reasoning of Judge SANBORN in *New York Life Ins. Co. v. McMaster,* 87 Fed. 63, and *McMaster v. New York Life Ins. Co.* 99 Fed. 856.

Another of the authorities relied on by counsel—one which he insists is directly in conflict with *Mamlock v. Fairbanks* and is supported by the better reasoning—is *Strohn v. D. & M. R. Co.* 21 Wis. 554; citing *Boorman v. Am. Exp. Co.* 21 Wis. 154, and *King v. Woodbridge,* 34 Vt. 565, in both of which it was held that a party is presumed to consent to the conditions of a paper to which he deliberately becomes a party, the idea being that it would be negligence for him not to know its contents; and so such knowledge is conclusively presumed in the absence of some reasonable excuse for his ignorance. So far as the expressions in the *Boorman* and *Strohn Cases*

indicate that mere ignorance is a sufficient excuse for avoiding a paper, they have not been followed in recent years, as we have shown. The real situation in the *Strohn Case* is that property was delivered to the railway company for transportation on the faith of a verbal understanding had at the time of the delivery. The property had been sent forward and was so situated that the transaction could not be varied when the freight receipt, containing the clause complained of, was delivered to the shipper. Speaking to those circumstances the court said the shipper had a right to rely on the verbal understanding, and was not bound, immediately upon receiving the freight receipt, to examine it, and used expressions, it is true, somewhat out of harmony with *Mamlock v. Fairbanks.* The case has never been cited by this court during the thirty-six years since it was decided, to sustain such expressions as good law; while *Mamlock v. Fairbanks* has been followed over and over again, is firmly entrenched in the jurisprudence of the state, and is treated by text writers and courts elsewhere as proclaiming sound doctrine. The *Strohn Case,* with the limitations necessary to harmonize it with current authority, was cited in *Schaller v. C. & N. W. R. Co.* 97 Wis. 31, 71 N. W. 1042, this language being used:

"From the delivery and acceptance of the bill of lading at the time the goods were delivered to defendant for shipment, the presumption arises that plaintiff assented to it. . . . The presumption is not conclusive, but mere ignorance of the contents of the bill of lading, arising from failure to read it or to make some reasonable effort to obtain information in that regard, in the absence of any evidence of fraud on the part of the defendant or of the use of any means to deter the shipper from fully understanding the contract, is not sufficient to overcome it."

Again the court, after saying, in effect, that ignorance is no defense to a contract where the making thereof springs from inexcusable neglect, used this language:

"The familiar rule applies that if a person makes a written contract with another, he takes upon himself the responsibility of acting intelligently, and exercising ordinary care to inform himself of its provisions. Failure to read the contract or to examine it, or, in case of inability to do so without assistance, to obtain such assistance if reasonably within reach, is negligence as a matter of law."

To the same effect are *Herbst v. Lowe,* 65 Wis. 316, 26 N. W. 751; *Fuller v. Madison Mut. Ins. Co.* 36 Wis. 599; *Bonneville v. Western Assurance Co.* 68 Wis. 298, 32 N. W. 34; *Wilcox v. Continental Ins. Co.* 85 Wis. 197, 55 N. W. 188; *Coates & Sons v. Buck,* 93 Wis. 128, 67 N. W. 23. In this class of cases the question involved was, under what circumstances can a person, by oral evidence, impeach a written contract? As shown in the federal cases, the deceit of one person affecting the conduct of another in becoming a party to a written instrument, must refer to the particular instrument in controversy, and to deceit in the transaction leading to the injured party's signing or accepting the instrument. That applies in this case to the signing of the applications for insurance, but not to the acceptance and retention of the policies.

Another of the authorities cited on this branch of the case is *Gunther v. Ullrich,* 82 Wis. 222, 52 N. W. 88, where a person purchased real estate on the faith of false representations, made at the time of the purchase, respecting the location of the property. *West v. Wright,* 98 Ind. 335, is another case. There a person purchased land of another on the faith of false representations made by such other as to the record title to the property.

Strong language was used in deciding the case, condemning the transaction and stating the law along lines many times laid down by this court, but having no reference to such a situation as that here presented, so far as relates to the acceptance and retention of the policies, leaving out of view for

the time being the question of whether anything occurred sub-sequent to the making of the applications to induce such ac-ceptance and retention, reasonably calculated to deter the ap-plicants from examining the policies. *McKinnon v. Vollmar,* 75 Wis. 82, 43 N. W. 800; *Montreal R. L. Co. v. Mihills,* 80 Wis. 540, 50 N. W. 507; *Porter v. Beattie,* 88 Wis. 22, 59 N. W. 499; *Beetle v. Anderson,* 98 Wis. 5, 73 N. W. 560; *Hart v. Moulton,* 104 Wis. 349, 359, 80 N. W. 599. Counsel quotes, and recited it upon the oral argument with appropri-ate emphasis, overlooking, as it seems, that it does not apply to the facts of this case,—leaving out of view for the moment, as before said, the question of whether any circumstance oc-curred at the time of the delivery of the policies reasonably calculated to mislead the persons insured,—this language from *West v. Wright,* 98 Ind. 335.

"I cannot, however, assent to extend the maxim *caveat emptor* so far as to hold that where a vendor of real estate, for the fraudulent purpose of effecting a sale, makes a positive representation of particular facts respecting the title, which he knows or has good reason to believe to be false, and which turn out to be false in fact, but which, if true, would make the title good, he cannot be held liable in an action for fraud, or the vendee can have no right to rescind, because he had it in his power to ascertain from the records the truth or false-hood of the representation and the true state of the title, but has neglected to do so, in reliance upon the truth of the vendor's representation of the facts. There may be good prudential reasons why, when I am selling you a piece of land, or a mortgage, you should not rely upon my statement of the facts of the title, but if I have made that statement for the fraudulent purpose of inducing you to purchase, and you have in good faith made the purchase in reliance upon its truth, instead of making the examination for yourself, it does not lie with me to say to you, 'It is true I lied to you, and for the purpose of defrauding you, but you were guilty of negligence, of want of ordinary care, in believing that I told the truth; and because you trusted to my word, when you ought to have

suspected me of falsehood, I am entitled to the fruits of my falsehood and cunning, and you are without remedy.' "

It will be easily seen that the court held that there was no negligence on the part of the injured person in that case, because he relied upon the positive representations made by the wrongdoer at the time the transaction was entered into. To make that apply to this case we must be able to point to something said or done by the appellant at the time the policies were delivered, reasonably calculated to deter the persons receiving the same from making any examination thereof. *Prince v. Overholser,* 75 Wis. 646, 44 N. W. 775, was referred to. There the rule of *Mamlock v. Fairbanks,* 46 Wis. 416, 1 N. W. 167, was expressly affirmed, the court saying, in effect, that to take the case out of the rule there must be fraud or mistake of such a nature that the defendant could not, with reasonable diligence, acquire knowledge thereof when put upon his inquiry.

We should say in passing that we deem it to be elementary law, as held in *Locke v. Williamson,* 40 Wis. 377, that when a person receives an article pursuant to an order or contract therefor, he is put upon inquiry as to departures therein from the thing bargained for, which are open to ordinary observation, nothing occurring then to induce him to accept the article as satisfying the order or contract without examining it. Such is the rule laid down in the federal court in the *McMaster Cases* in all stages of the litigation over the six policies involved in the transaction, with which the court had to deal. In all stages of the litigation up to and inclusive of the final disposition thereof by the supreme court of the United States, as we shall see hereafter, the rule we have stated was clearly recognized and applied. We might go on through substantially all the great array of cases cited by counsel to show that deceit practiced by the appellant's agent in obtaining the applications for insurance excused the applicants from making any examination of their policies when re-

ceived, with the same result as with those to which we have referred. To do so would draw this opinion out to a very great length, which is what we desire to avoid. We will suspend on the question here discussed, believing that the law is fully established and that we have clearly demonstrated it, that a person is negligent in receiving an article and accepting it without any examination thereof, wholly relying on representations, whether fraudulent or not, made at or previous to the time when the article was contracted for or ordered. In this it should be understood that the mere reception of the article does not imply acceptance thereof till the expiration of reasonable time for examination. That is the rule of *Locke v. Williamson.*

It is earnestly contended by counsel for respondent that the former decision, holding that negligence on the part of the insured persons, in receiving and retaining the policies for a long time without objection, stands effectively in the way of respondent's recovery, is wrong on principle: (1) Because negligence does not preclude relief by a person damaged by intentional wrongdoing; (2) Negligence of one does not accrue to the benefit of another to whom he owes no duty; (3) The court's decision is out of harmony with the doctrine that a person cannot profit by his own wrong; (4) Nothing short of actual knowledge prevents relief till the right involved is extinguished by the statute of limitations,—that reasonable means of knowledge, and negligence in not profiting by it, from which knowledge in fact is presumed, is not sufficient. We will briefly answer each of the propositions, though in doing so we must repeat, somewhat, what was formerly said.

1. The conclusive answer to the first proposition is that it does not necessarily apply here, leaving out of view the question of whether anything occurred inducing belief as to the character of the policies at the time they were received, because it relates only to when there is a concurrence of inten-

tional wrongdoing and negligence producing the injury, not where inexcusable inadvertence actually intervenes between the wrong and the injury complained of, so as to stand as the real producing cause of such injury.

2, 3. The second proposition does not fit this case, because the inexcusable negligence of a person, in entering into or abiding by a business transaction with another guilty of deception, influencing such person's conduct in the matter, is not held to be a direct defense to such person's claim for redress, but to be evidence of acquiescence with knowledge of the facts, or in connection with injury to such other by delay in such person's asserting his right to relief, if such assertion were successful, or in connection with some other efficient circumstance, to estop such person from doing anything inconsistent therewith. Even a wrongdoer has rights which the law respects. A person injuriously affected by the wrong of another in a business transaction may himself be guilty of wrong in asserting his right to redress, so affecting the latter as to give him the right to use the doctrine of estoppel for his protection against the former's claim. A third answer is this: Inexcusable negligence of a person in his business transactions with another is not, as said in the former opinion, held to be a defense to the former's claim for redress out of any favor found in the law for the latter, or defense, strictly so called, to such claim at all, in any other sense than that the law affords no redress under the circumstances, its policy being only to aid those who use some reasonable degree of care to guard their own interests. All of such reasons, we apprehend, will readily be recognized as elementary law.

Answering more particularly counsel's first proposition, a contract entered into by fraud on one side, or mistake through negligence on the other, is not absolutely void. While in one sense it is not the contract of the latter at all, because of his nonassent to its terms with knowledge of the facts, he may add the element of assent at any time, actually or con-

structively.  Such a transaction is not then, in a legal sense, absolutely void; it is only voidable.  *Weed v. Page,* 7 Wis. 503, 512; *Potter v. Taggart,* 54 Wis. 395, 400, 11 N. W. 678. When the essential element of assent is added, it gives effect to the transaction as a binding contract from the beginning, the same as if no deception had been practiced.  The evidence of such assent may rest solely in inexcusable neglect of the injured person to do anything inconsistent with the validity of the contract.  Then if such person fails to recover, such other does not, in the sense of the salutary doctrine which counsel invokes, profit by his own wrong, but by such person's submission to the wrong.  Or, if the other element be added, of misleading the wrongdoer himself in the meantime, the recovery is defeated by such person's own wrong, misleading the first wrongdoer to his prejudice, upon principles of estoppel.  Speaking of contracts voidable for fraud, it is said in Wald, Pol. Cont. p. 539:

"Omission to repudiate within a reasonable time is evidence, and may be conclusive evidence of an election to affirm the contract; and this," says the writer, "is in truth the only effect of lapse of time," by itself.

Again the writer says (page 541):

"The party who made the misrepresentation in the first instance may have acted on the faith of the contract being valid in such a manner that a subsequent rescission would work irreparable injury to him."

Keeping in mind that rescission, whether the object of a suit in equity or forming the basis of a rescission at law, is governed by equitable principles (*Gates v. Raymond,* 106 Wis. 657, 82 N. W. 530; *Gay v. D. M. Osborne & Co.* 102 Wis. 641, 78 N. W. 1079; *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571), the application of this language from the opinion of Sir BARNES PEACOCK, in *Lindsay Petroleum Co. v. Hurd,* L. R. 5 P. C. 221, 239, to the facts before us is not difficult to see:

"Where it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where by his conduct and neglect he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted, in either of these cases, lapse of time and delay are most material. . . . Two circumstances, always important in such cases, are, the length of the delay and the nature of the acts done during the interval, which might affect either party and cause a balance of justice or injustice in taking the one course or the other, so far as relates to the remedy."

In *Clough v. L. & N. W. R. Co.* L. R. 7 Exch. 26, 35, MELLOR, J., said, in effect, that if a person is induced to enter into a contract by fraud, he has his election to avoid it till he elects to affirm it, and that lapse of time alone may constitute conclusive evidence of such election, with this exception, however:

"If the rights of innocent third persons intervene in the meantime, or if in consequence of the delay the position of the wrongdoer is affected, it will preclude him (the injured party) from exercising his right of rescission."

See also to the same effect, *Oakes v. Turquand,* L. R. 2 H. L. 325; *Houldsworth v. City of Glasgow Bank,* 5 App. Cas. 317; Kerr, Fraud & Mistake (3d ed. Williams), 10.

Those principles apply with great force to this class of cases. The respondent had the full benefit of his insurance for nearly a year before he repudiated the transaction, and his assignees had the benefit of theirs for months before they acted in that regard. The entire period covered by the first premium upon respondent's policy had, before he refused to abide by such policy, nearly expired. No one would venture to claim that if he had died during such period of delay the company would not have been bound by the policy and his personal representatives would not have enforced it. During all that time the money paid by respondent for his policy

formed a part of the fund relied upon by the other policy holders for their protection, part of the assets of the company upon which all its operations were based. It was not guilty of any moral turpitude except by imputation. Its officers were not guilty of any wrongdoing whatever. They supposed, and had a right to suppose, for months, that the company's soliciting agent acted honestly in obtaining the applications for the policies. They knew that the policies issued, received and retained were in strict accordance with the applications. They carried the risk assumed on their books as part of their liabilities, and the premiums paid, as before indicated, as part of their assets. All the policy holders of the company were interested in the fund of which the money sought to be recovered formed a part, and many of them, we may rightly assume, joined the company during the period of delay.

Speaking more particularly in regard to the third reason we have given for condemning counsel's second proposition, that the rule declared in the former opinion, that negligence may prevent a recovery in a case like this, is wrong on principle,—the rule following the maxim, The law assists the vigilant, not the careless, *"Vigilantibus, et non dormientibus succurrant jura,"* is grounded on that wise policy in the law which at every turn of life casts upon all persons in severalty, who are of sound mind and mature years, the personal duty to exercise some reasonable degree of care for their own protection, enforcing it, in some cases, solely by refusing to open the doors of judicial tribunals to those who deal heedless of their interests, depending upon the courts to protect them from injurious results, as that policy which in the end best protects individual members of society and at the same time guards against those responsibilities that can be better borne in an individual way, being unnecessarily or unreasonably, to any extent, cast upon the public at large. In that, as can readily be seen, the courts, while not excusing at all the

iniquity of the wrongdoer, regarding the interests of society
as a whole as well as individual rights, place a reasonable
limit upon the use of those instruments provided for admin-
istering justice between man and man.   Litigants do not bear
the burden of administering justice except in a very small
degree.   It is borne in the greater part by the public at large.
Proper appreciation of that will enable one to easily and
clearly see the wisdom of that policy which extends the bene-
fit of courts of law in business matters, only to those who use
common prudence to guard their own interests.   One may
consent, either actually or constructively, to be imposed upon,
if he sees fit, in a business transaction, and the courts will
not interfere.   It is unfortunate that courts have sometimes
been so swayed by apparent hardship in applying the rules
we have stated to particular cases, as to use language in
opinions leading to false notions both as to the reason of the
law and its application,—language quite liable to mislead un-
less one is firmly grounded in the philosophy of the law so as
not to be unduly disturbed by the rhetorical flights some-
times indulged in by judges, seemingly losing sight, for the
moment, of a safe landing place.   Evidence of such mental
excursions is not hard to find in some of the quotations called
to our attention by the learned counsel for respondent, which
have, perhaps not unreasonably, produced conviction in
counsel's mind that the judgment appealed from is wholly
right.   The correct idea is expressed by a leading case in the
supreme court of the United States, often cited and followed
by this court, and cited by the learned counsel for respondent,
substantially thus: Want of proper care on the part of the
vendee of an article to protect himself from imposition takes
from him all just claims for relief, whether his negligence is
attributable to his indolence or credulity.   *Slaughter v. Ger-
son,* 13 Wall. 379.   Clearly, the court used the term "just
claim" solely as regards the right of the purchaser to invoke
judicial power to save himself from loss, not with the idea

that the moral wrong done by the vendor could be balanced by his victim's negligence. Obviously, there are many such wrongs for which the machinery of courts does not furnish a remedy. Perhaps the reason for the rule is as clearly stated in the early case of *Moore v. Turbeville*, 2 Bibb, 602, often cited by courts and text writers, as anywhere:

"There are many instances in which a person may be guilty of a moral delinquency, without incurring a legal responsibility; for legal obligations are necessarily more circumscribed in their nature than moral duties. *Fides servanda* is indeed a rule of law, as well as of morality, and will be rigorously enforced in favor of one who is chargeable with no culpable negligence or inattention to his own interest. But to one so chargeable, the law will not afford relief. . . . The law does not deny its aid in such case, because it looks upon a want of candor and sincerity with indulgence, but because it will not encourage that indolence and inattention, which are no less pernicious to the interest of society. A diligent attention to our own concerns as well as good faith to others, is a virtue; and the law, while it recognizes the rules which tend to preserve the latter, at the same time is careful to guard the principles which prompt to the exercise of the former. With respect to points plainly within the reach of every man's observation and judgment, and where an ordinary attention would be sufficient to guard against imposition, the want of such attention is, to say the least, an inexcusable negligence. To one thus supinely inattentive to his own concerns, and improvidently and credulously confiding in the naked and interested assertions of another, the maxim, '*Vigilantibus et non dormientibus jura subveniunt*,' emphatically applies, and opposes an insuperable objection to his obtaining the aid of the law."

The supreme court of Ohio, in *Ætna Ins. Co. v. Reed*, 33 Ohio St. 283, speaking on the same subject and citing in support a multitude of authorities, said that in matters of contract, if one negligently omits to guard his own interests, the law will not lend its help to aid him. Pages could be covered in citations to the same effect.

4. Counsel for respondent further attacks the former decision, standing firmly on the theory which the circuit court supposed ruled the case, that, conceding negligence may affect the right to recover in a case like this, it does not so operate in the absence of actual notice of the fraud; that if the wronged party is not thereafter negligent in electing what course he will pursue and informing the wrongdoer thereof, the remedy for rescission in equity or for damages at law based on a previous rescission by the act of the party, will remain open to such party. It will be observed that the trial court did not deal at all, in the findings, with whether the policy holders were negligent in discovering the facts respecting the fraud. Counsel's contention was evidently adopted, that mere constructive notice, evidenced by negligence in not profiting by reasonable opportunity to discover the fraud, only sets running the statute of limitations. We confess there is some judicial support for that, contrary, however, to the great weight of authority, and to *Mamlock v. Fairbanks,* 46 Wis. 416, 1 N. W. 167, and authorities affirming that case in this court, as respondent's counsel seem to appreciate. An earnest appeal to disregard the *Mamlock Case* is made, though it is nowhere pointed out that it has been directly discredited by this or any other court or text writer, and it is not and cannot be denied that it has been here many times affirmed in spirit if not in letter. We have not been able to discover in any of the authorities brought to our attention a satisfactory reason for departing from the established judicial policy of the state indicated in that case. No case in this court has, in the decision thereof, directly or indirectly favored the doctrine that the right to rescind a contract for fraud continues during the running of the statute of limitations regardless of constructive notice of the facts. Means of knowledge of the fraud, said the court in the *Mamlock Case,* is always a material question in determining the right of rescission, and that is within the principle of *caveat*

*emptor,* citing as a "principle so universally recognized by the authorities that it needs no further reference," Kerr, Fraud & Mistake, 101, to the effect that he who has under all the circumstances reasonable opportunity to discover the deceit, is chargeable with knowledge thereof to the same effect as if he possessed actual knowledge of the subject. That doctrine is laid down in 2 Parsons, Cont. pp. 781, 782, in these words:

"If he rescinds on the ground of fraud, he must do it at once on discovering the fraud."

"Any delay, especially if it be injurious to the other party, would be regarded as a waiver of his right."

"The mere lapse of time, if it be considerable, goes far to establish a waiver of this right; and if it be connected with an obvious ability on the part of the defrauded person to discover the fraud at a much earlier period, by the exercise of ordinary care and diligence, it would be almost conclusive."

In *Erlanger v. New Sombrero Phosphate Co.* 3 App. Cas. 1283, the language heretofore quoted from the judgment of the privy council in *Lindsay Petroleum Co. v. Hurd,* L. R. 5 P. C. 221, was cited with approval, with remarks by Lord BLACKBURN, recognizing that the deceived party may forfeit his right to rescind by failing to make his claim in that regard with reasonable promptness after "he knows or may with reasonable diligence know that he has been defrauded." Moncreiff, Fraud & Misrep. 282.

*McCarty v. New York Life Ins. Co.* 74 Minn. 530, 77 N. W. 426, is cited by counsel as in direct conflict with *Mamlock v. Fairbanks.* The court there treated the subject of negligence as evidence of waiver, and negligence as a defense, but not as involving the right to judicial remedies as affected by public policy. A clear distinction was pointed out between negligence of a person in not protecting himself from fraud perpetrated by another at the time of signing and delivering to such other an application for an insurance policy, and negligence in failing to discover obvious departures from the

application when the policy is received, nothing occurring at the time to lull such person into security on the subject. The language used by the learned judge as to the last situation mentioned, wherein some discrimination is made between the rights of a person injured by the fraud of another, as against such other and as against third persons, leaving out of view the doctrine of estoppel, overlooked as it seems some elementary principles which we have mentioned, and is in direct conflict with the federal cases to which we have referred and will hereafter more particularly refer. It is significant that the subject was treated very briefly, no authorities being cited to support what was said. However, where the court, earlier in the case, discussed and disposed of the question of whether constructive notice of the fraud sets running the time within which the wronged party can rescind, constructive notice was recognized as effective as well as actual notice, and it was inferentially held that a statement of the rule not so recognizing the law to be is inaccurate. Here is the language used:

"The rule, as generally laid down in the books, is that the right of rescission accrues only after discovery of the fraud, and that delay is not imputable against the party defrauded, until he makes that discovery. But, we have no doubt that there may be cases where the party is so grossly negligent in failing to use means of knowledge within his possession, which he was bound to avail himself of, that delay would be imputable to him, even before he actually discovered the fraud. Hence perhaps a more accurate statement of the rule is that delay is not imputable to the party defrauded until he has sufficient knowledge of the fraud to make the delay material, or such means of knowledge as he was bound to avail himself of."

Leake, Cont. 324, and *Browne v. McClintock*, L. R. 6 H. L. 456, were referred to, which amply support what was said. That which the learned judge said was perhaps the way to accurately state the rule was thus recognized by Mr. Justice

FIELD to be the law, in *Slaughter v. Gerson*, 13 Wall. 383, to which we have before referred:

"A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before him, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statement of another."

The exception mentioned,—which is found in all careful statements of the law in these words: "where no concealment is made or attempted"—we have heretofore shown, refers to concealment made or attempted by some act of the wrongdoer at the time, or efficiently reaching to the occasion, when the wronged party should exercise his senses, reasonably, to protect his own interests. It will be seen that the law was so distinctly applied in the *McMaster Cases* to which we shall presently refer. We might go on reenforcing the *Mamlock Case* by a large number of citations, though we confess that the inaccurate statement of the rule under discussion, recognized by Judge MITCHELL, as before indicated, can be found many times in legal opinions where constructive knowledge was not material, and in some instances, probably, it formed the basis for erroneous decisions, and for misleading judicial declarations in others, some of which are found quoted in the brief of counsel for respondent and were referred to by him with great emphasis upon the oral argument. It would seem that the confession by so learned a judicial writer as Judge MITCHELL, that the statement of the law as to when time for the rescission of a contract for fraud com-

mences to run, as in the *Mamlock Case,* is probably the strictly accurate way to put the matter, and the other authorities to which we have referred, render any further vindication of such case unnecessary. If, however, it needs further support, that will be found in our treatment of the next reason urged by counsel for respondent why our former decision is wrong.

Leaving out of view what we formerly regarded as controlling decisions of this court, the *McMaster Cases* in the federal court were cited as worthy of the highest regard in reaching a correct conclusion. It is now contended by respondent's counsel, as we understand his argument, that admitting the effect of the decisions in the court of appeals, those cases (87 Fed. 63, and 99 Fed. 856), if in any event they could be considered as voicing the doctrine of the federal courts, are of no force because the last decision was reversed by the supreme court of the United States, it being held, "in substance, that knowledge of the contents of the policies was not 'legally imputable' to McMaster because of his failure to read them." "But," says the learned counsel, "it is not necessary to multiply citations to show the *error of the assumption* that the doctrine of constructive notice *can be made available as a cover for fraud.*" In that is a most striking indication of the misapprehension in the mind of counsel of what we aimed to say, and in our view plainly said in the former opinion, and a strikingly illegitimate characterization of the solemn decision of this court, which was based on what counsel admits to be the established doctrine if *Mamlock v. Fairbanks,* 46 Wis. 416, 1 N. W. 167, is to stand as the settled law. Constructive notice was not formerly held to be under any circumstances a "cover for fraud." It was held to be evidence of assent, regardless of the fraud, or, if not such, of inexcusable negligence, waiving judicial remedies for fraud; and not upon mere assumption, but upon the authority of this court in previous decisions, and of most other courts.

Here we may, as it seems, properly and benefically digress to make some observations on aspects of the argument for and on rehearing. It is hardly legitimate, in endeavoring to persuade the court to recede from a decision, admittedly right if a previous decision of the court of long standing is to be followed, to refer to the later decision as based on error of assumption, and to speak, as was done in the motion for reargument, of the former decision as if it were a personal affair, and of decisions in this and other courts, and the reasoning therein found, as mere "wind of doctrine." It is not understood here that the former opinion was based on assumption, or upon anything but judicial authority, largely drawn from our own judicial history. It was a careful, considerate decision of the court, voiced by the writer, as its instrument, to whose lot it happened to fall to perform that duty, and who performed it, keeping strictly within the lines decided upon. Courts are not infallible in fact, and never will be so long as the law must be administered by human agencies; but their judgments, based on judicial authority, are not properly referred to as based on "error of assumption," or mere "wind of doctrine." Nor are they the work of any particular member of the court,—not of the one upon whom may devolve, under the court rules, the duty of giving voice to the grounds for it in the opinion, any more than the others. The idea sometimes in the mind of counsel in viewing a decision, that it is something other than that of the court, is erroneous, and is liable to stimulate inconsiderate action on the part of counsel, both in language and procedure. It gives to counsel the appearance of not appreciating the responsibility resting here to decide controversies as to the best of our ability it is given us to decide, regardless of the effects and consequences upon parties or counsel in the particular litigation, necessary to enable them to view with complacence the final result, whatever it may be. In connection with these remarks, to the end that the beneficial purpose intended may not be miscon-

ceived, we wish to record the fact that we greatly appreciate the earnest, faithful devotion of the eminent counsel for respondent in this case to the interests he stood for in court, and entertain a high regard for his ability, industry and courage, which is manifest on his every appearance here, and for the aid which his labor has given us in arriving at a correct conclusion now.

Returning to the *McMaster Cases*, we will say, and endeavor to demonstrate, that counsel is in error in his view that the supreme court, in reversing the decision of the court of appeals, 99 Fed. 856, held that possession of a policy of insurance does not impute knowledge of its contents, in the absence of any deception practiced upon the possessor subsequent to his making the application therefor, reasonably calculated to deter him from examining such policy at the time of its receipt. The court, as it seems to us, held directly to the contrary. We can best demonstrate the correctness of that view by giving a full history of the *McMaster* litigation as found in the federal reports. Here is the history: Fred A. McMaster signed applications for six policies of life insurance in the New York Life Insurance Company, delivering them to such company's agent. After the applications were signed the agent, without the applicant's knowledge or consent, wrote into them these words: "Please date the policies same as applications," in order to further his own interests by obtaining credit for the work in the year in which such applications were made, helping to make up the necessary amount of insurance taken by him during such year to entitle him to a greater percentage upon the business of such year, as his compensation for service than he would otherwise obtain. The policies were issued, dated as directed, making the annual premium payment December 12 in each year, when it otherwise would have been made December 18 in each year. As the applications were when signed, the first payment would have covered thirteen months from the time

the first premium was paid, which was December 26, 1893. By the unauthorized act of the agent, the life of the policies was cut down so they had but twelve months and seventeen days, after the actual delivery thereof, to run. McMaster failed to pay the premiums on his policies when due by their terms, December 12, 1894. He died December 18th, the day he supposed the payments were due. An action was brought by his administrator to reform the policies, advancing the due date of the annual premium from December 12th to December 18th of each year, in accordance with the applications as they were when signed. There was evidence that the policies were delivered ostensibly responsive to the applications, no evidence being produced of any communication at the time of such delivery to McMaster to deter him from examining the same. There was evidence to the effect that the agent represented, when the applications were made, that the first payment of premium would cover a period of thirteen months. McMaster made no complaint at any time that the policies were not as agreed upon. He did not read them or know that they were not so drawn as to make the first payment carry the policies till December 18th the next year. The company's collector called on him December 11th or 12th before he died, to whom he said he did not intend to keep up the policies, but made no complaint whatever. The court held, on those facts, that if fraud was committed on McMaster, his keeping the policies as he did, without objecting when he had ample opportunity to know their contents and to reject them if he did not want them, since he was not deterred from doing so by anything said or done by the company after the applications were signed, was in law a waiver of the fraud, precluding any judicial relief therefor. The court said:

"He could not have been deceived as to the terms or legal effect of these contracts, if he read them. It was his duty to read and know the contents of the policies when he accepted them. It is true that the evidence is that he did not read them, but the legal effect of his acceptance is the same as if

he had read them. He had the opportunity to read and to learn their contents, and, if he did not, it was his own gross negligence, and no act of the insurance company or its agent that concealed them and misled him as to their effect."

Taking up the question of whether the statement made by the agent when the applications were made, to the effect that the first payment would cover thirteen months, was sufficient to take the case out of the rule requiring a person, upon receiving an article ostensibly upon fulfillment of an order or contract, to see obvious departures therein from the thing bargained for, the court held that nothing short of something said or done at the time of the delivery of the article, the applicant therefor then having ample opportunity to examine it as to defects therein, open to ordinary observation, throwing him off his guard and reasonably excusing him from making such examination, will excuse him from improving the opportunity for such examination; and if he does not intend to assent to keep the contract in satisfaction of his order, within a reasonable time thereafter, from notifying the party from whom he received such article that it will not be so accepted. This language on the subject was used, in addition to that just quoted:

"The statement of the agent fourteen days before the deceased received the policies that they would insure him for thirteen months from the payment of the first premiums was not a statement of an existing fact. It was not calculated to impose upon him, or to prevent him from reading his policies and learning for himself whether this promise had been kept or broken."

To the quoted language in the whole the court cited many authorities, including cases decided by this court. The conclusion reached was that neither a court of law nor of equity could afford the McMaster estate relief. The decision was inferentially approved by the federal supreme court by its judgment refusing to issue a writ of *certiorari* to review it. 171 U. S. 687, 18 Sup. Ct. 944. Later, McMaster's adminis-

trator commenced an action to recover upon the policies in
the circuit court for the Northern district of Iowa, and was
defeated. The case was carried to the circuit court of ap-
peals for review, where the judgment was affirmed, the
court following the decision in 87 Fed. 63, the evidence
being substantially the same in both cases, except in the
latter it was made to appear that the agent personally deliv-
ered the policies to McMaster, stating then, in response to the
latter's inquiry as to whether they were as promised and
would insure him for thirteen months for the first premium,
that they were and would; and the premiums were paid upon
such assurance being given. The court held that such circum-
stances, as a matter of law, were not sufficient to excuse Mc-
Master for not knowing the terms of his policies and season-
ably objecting to them if he did not care to accept them as
satisfying what he bargained for. The judgment was carried
for review to the supreme court, and was there reversed solely
on the ground that the assurance to McMaster at the time of
the delivery of the policies, rendered the question of whether
his keeping them as he did, without objection, constituted an
acceptance thereof as satisfying what was bargained for, one
of fact for the jury. The general principles upon which the
case was decided by the trial and appellate courts were fully
approved, but it was held that the false representations made
at the time of the delivery of the policies had sufficient tend-
ency to throw McMaster off his guard,—to lull him into se-
curity as to their being what he expected,—to prevent the
court from holding as matter of law that he was inexcusably
negligent, precluding him from successfully invoking the aid
of the court to redress the wrong committed by the company's
agent in its name. Speaking of the changed situation pro-
duced by giving proper significance to the circumstance men-
tioned, this language was used:

"We are unable to concur in the view that McMaster's
omission to read the policies when delivered to him and pay-

ment of the premiums made constituted such negligence as to estop plaintiff from denying that McMaster by accepting the policies agreed that the insurance might be forfeited within thirteen months from December 12, 1893." *McMaster v. New York Life Ins. Co.* 183 U. S. 25, 22 Sup. Ct. 10.

There is the rule clearly recognized that when a person receives a policy of insurance in response to an application therefor, or as the result of a written application, or a written application and verbal communications between him and the agent of the company issuing the policy, unless some misrepresentation or fraud is practiced upon him at the time of the delivery of the policy, furnishing some reasonable excuse for his not reading and knowing its provisions so far as they would, by such reading, be readily understood, it is such negligence not to so read and know, that if he neglects to object to the policy within a reasonable time after receiving the same, the delay will estop him from obtaining judicial aid to remedy any injury he may suffer from the policy not being as agreed upon. That, as we have seen, is not because of any breach of duty on his part to the wrongdoer, but because of breach of duty to himself, or his assent to the contract. The idea of counsel for respondent that there can be no negligence in circumstances such as we have discussed which can help the wrongdoer because the injured party owes the wrongdoer no duty, grows out of failure to appreciate that negligence in a case like this does not, except when coupled with circumstances effecting an estoppel, presuppose duty of the injured person to the wrongdoer, but, as we have indicated, duty of such person to himself.

All the reasons advanced for a different decision than that formerly announced as to the law of this case, which seem worthy of attention, have now been discussed. There remains to be considered the subject of whether we before correctly applied the law to the facts. At the threshold of that inquiry we meet the point made by appellant's counsel—not considered on the former occasion because unnecessary in view of

other questions decided—that there is no evidence that *Bost-wick* placed himself in a position, before this action was commenced, to give him a complete cause of action.    That is, that he had not, before his suit was comenced, rescinded his policy.    There is no controversy but that, promptly after he actually discovered the facts, he complained of the fraud established in the case and made known to appellant his election to disaffirm the policy.    It does not appear that then, or at any subsequent time, he formally offered to return his policy, or that he made, before suit brought, a formal tender thereof to appellant.    It is undisputed, however, that he insisted upon having his money back or a new policy; that he would not abide by the transaction as it stood; and that appellant positively refused to make any change in the matter, and denied his right to rescind.    Such denial was, in effect, found by the trial court and not excepted to.    There is a finding that respondent offered to return his policy, which finding is excepted to.    It is considered that the repeated demands by respondent for a return of his policy or for a new one in accordance with his understanding of the application, carried with them, inferentially, a sufficient offer to surrender the policy to effect a complete rescission thereof, before suit was commenced, in view of appellant's unqualified denial of respondent's right.    This court has several times so held under similar circumstances. *Potter v. Taggart,* 54 Wis. 395, 11 N. W. 678; *Herman v. Gray,* 79 Wis. 182, 48 N. W. 113.

True, a cause of action at law to recover the consideration paid upon a contract void for fraud is not complete so that a suit may be maintained to enforce it until the transaction has been fully repudiated, the complaining party having done all that in justice he ought to do, measured by settled laws on the subject, to restore the wrongdoer to his former position.    The idea is that the existence of the cause of action itself depends upon the contract, binding till avoided, having been in fact avoided.    Hence, in such a case as this the plaint-

iff must fail unless he is able to show that before he commenced the same the contract relations between him and the defendant which were fatally tainted with fraud, had been wholly severed so far as was reasonably within his power to accomplish it. We must not overlook the distinction between an action at law based on rescission for fraud,—an action where rescission necessarily precedes the existence of the cause of action,—and an action in equity for rescission. In the former case rescission is effected by the act of the party injured. In the latter he seeks the aid of a court of equity to effect rescission. In the one case there must be an election to rescind, fully acted upon. That requires the complainant, before commencing suit, to return or offer to return that which he received, or willingness and ability to return the same, and such conduct on the part of the wrongdoer as to show that a formal offer or tender would have been wholly useless. In the other case there must be at least willingness and ability to restore the wrongdoer to his former position so far as justice requires, as a condition of the contract being set aside by the judgment of the court. These distinctions, which have been recently carefully elucidated by this court (*Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571), need to be kept in mind. They have not always been, as indicated by the cases cited. We need not go further than *Potter v. Taggart, supra,* to discover, in an action at law based on rescission, language wholly appropriate to an action in equity for rescission. In stating the conditions precedent to the bringing of the suit, it was said that the action was for rescission, and the rule in relation to the necessary conduct of the complainant to maintain such an action was somewhat confused with that requisite to an action in equity. That was intensified in *Herman v. Gray, supra.* However, those cases may be considered as holding, and have generally, we think, been so considered, that there must be at least an unconditional offer to restore the wrongdoer to his former position before

suit brought, or the equivalent, such as a complete repudiation of the fraudulent transaction, notice thereof to the wrongdoer, unconditional denial of the right of rescission on the latter's part, his attitude being such as to render a formal offer to return to him what he parted with useless, and a willingness and ability to make such return so far as justice requires, at the time of the trial, enabling the court then to give back to him what the complainant could not because it would not be received. The facts of this case fully meet those requirements, so we hold that they effected a complete avoidance of the policy by respondent before the action was commenced. His insistence, from the time he discovered the fraud down to the time of the commencement of the suit, upon a return of his money or possession of such a policy as he bargained for, and the unqualified refusal of the appellant to do either one thing or the other, rendered a formal offer on the former's part, to tender back his policy, a useless proceeding.

Some other points are made by appellant, which are rendered immaterial by the conclusion we have reached.

Now in applying the law to the facts, in view of what has been said each of the policy holders must be considered as having had knowledge of the fraud from the time when, by the exercise of ordinary care, he might have had it. That time, as to Parker and Barrington, was substantially when they received their policies. As to each of them, as we have seen, there was no statement made, or circumstance which occurred after the making of the applications, reasonably excusing him for not examining his policy when it was received. Since, as to each of them, when he did make such examination, he easily and at once discovered the fraud that had been perpetrated upon him, we must assume that he ought to have had knowledge thereof very soon after his policy came to his hands. We have no finding by the trial court as to electing to rescind the policies within a reasonable

time, except upon the theory that constructive knowledge of the fraud did not start the time therefor running. That left several months' time out of view. We adhere to our former decision that upon the evidence Parker and Barrington are chargeable as a matter of law with knowledge of the fraud from the time'they received their policies; that, as a matter of law, they waited thereafter an unreasonable length of time before electing to rescind the same. Therefore, as to the assigned claims, there can be no recovery.

As to the *Bostwick* policy it is considered that the assurance contained in the letter accompanying it when it came into respondent's hands, in effect that it was in accordance with the understanding which he supposed and had a right to suppose was written into the application, was reasonably calculated to lull him into security on the subject and cause him to lay the policy aside without examining it. It is useless here to discuss at length the particular wording of the letter containing such assurance. We have weighed it in every reasonable aspect in which it can, in our judgment, be viewed, resulting in a conclusion—not without some misgivings, we confess, on the part of some of the members of the court as to its correctness—that it was not as a matter of law entirely unreasonable for *Bostwick,* relying upon the letter which presumably he read, to lay the policy aside without reading it. True, the letter characterized the policy as a five per cent. debenture contract, and *Bostwick* testified that such a policy of a particular character was urged upon him by the agent at the time the application was taken, and that he then insisted that he would not take anything but a ten annual payment life policy, indicating, in one view, that the two policies were at the time of the application considered as entirely different. But it is also true, as we understand it, that a five per cent. debenture policy might well be written on a ten annual payment plan. Therefore, the assurance contained in the letter, that the policy was in accordance with the application,

might reasonably be said to convey the idea that it was a ten annual payment life contract with the five per cent. debenture feature which the agent so strongly recommended. In that view it is considered, not without some hesitation, we must say, that the circumstances characterizing the delivery of the policy are substantially the same as those in the last *McMaster Case*, which were deemed of sufficient significance to stand effectively in the way of a conclusion that, as a matter of law, McMaster knew the contents of his policies from the time he received them. Guided by that decision we are constrained to hold that the assurance to *Bostwick* may be reasonably said to satisfy the principle, said in the *Mamlock Case* to be concomitant and necessary to be considered with the maxim, *"Vigilantibus et non dormientibus jura subveniunt,"* and the rule of law based thereon, "that the seller must not use any art or practice any artifice, to conceal defects, or make any representations, or do any act, to throw the purchaser off his guard, or to divert his eye, or to obscure his observation, or to prevent his use of any present means of information." In that light we must hold that it does not appear as a matter of law that *Bostwick* was chargeable with knowledge of the fraud found to have been practiced upon him till he obtained actual knowledge thereof. That leaves the question of whether he ought to have read his policy when he received it notwithstanding the assurance accompanying it, one of fact not covered by the findings. It must be solved before a complete disposition of this case can be made. In the *McMaster Case*, it will be remembered, the farthest the court went was to hold that the question of whether the assurance given McMaster when his policy was delivered, was sufficient to render the question of whether he was inexcusably negligent, testing his conduct by what persons of ordinary care would generally do under the same or similar circumstances, in laying his policy away and not examining it, a jury question. The case was tried by a jury.

Here the case was so triable, but was by consent tried by the court. In that situation this court does not direct the judgment to be rendered if the unsolved issues of fact might go either way and it is doubtful which is proper, so that in attempting to decide them originally here injustice might be done. *Brown v. Griswold,* 109 Wis. 275, 85 N. W. 363. If the time within which respondent was bound to make his election to rescind the policy commenced to run from the time when he obtained actual knowledge of the fraud, the circumstances being such as not to charge him with constructive knowledge, then there should be a recovery as to his policy, as decided by the trial court. But if, on the other hand, it shall be found as a fact that, notwithstanding the language of the letter accompanying his policy, and all the evidence bearing on the question, he was inexcusably negligent in not looking at the paper when he received it or soon thereafter, and observing the evident departures therein from the one he intended to apply for, he is not entitled to recover.

*By the Court.*—The judgment of the circuit court is reversed and the cause remanded with directions to decide the question of fact suggested as being yet unsolved, and to then render judgment in accordance with this opinion.

CASSODAY, C. J. I concur in the result of the decision in this case, except as to the *Bostwick* policy; and as to that I think the judgment should be affirmed. As to that policy, the evidence, in my judgment, clearly brings the case within the well-established rule stated in a recent standard work, cited by plaintiff's counsel, as follows:

"By the overwhelming weight of authority, ordinary prudence and diligence do not require a person to test the truth of representations made to him by another as of his own knowledge, and with the intention that they shall be acted upon, if the facts are peculiarly within the other party's knowledge or means of knowledge, though they are not exclusively so, and though the party to whom the representa-

tions are made may have an opportunity of ascertaining the truth for himself." 14 Am. & Eng. Ency. of Law (2d ed.) 120.

The principle upon which the rule is based is sanctioned in cases cited in the opinion filed and the decision herein. It is cited merely as a concise summary of the law applicable to the *Bostwick* policy. Such evidence is, in my opinion, sufficient to sustain the judgment. The mere fact that the trial court did not specifically find upon the subject is no good ground for refusing to affirm the judgment so far as it relates to that policy. *Wilkinson v. Wilkinson,* 59 Wis. 560, 18 N. W. 527, and cases there cited; *Jones v. Jones,* 71 Wis. 520, 38 N. W. 88; *Deitz v. Neenah,* 91 Wis. 425, 426, 64 N. W. 299, 65 N. W. 500; *Williamson v. Neeves,* 94 Wis. 656, 69 N. W. 806; *Disch v. Timm,* 101 Wis. 189, 77 N. W. 196; *In re Callahan,* 102 Wis. 561, 78 N. W. 750.

A motion to file a second motion for rehearing was denied February 3, 1903.