Glassner v. Johnston, 133 Wis. 485.

<hr>

·GLASSNER, Respondent, vs. JOHNSTON and another, imp., Appellants.

*November 7—November 26, 1907.*

·*Cancellation of instruments: Life insurance policy: Fraudulent representations: Equity jurisdiction: Evidence: Admissibility: Competency: Self-serving declarations: Presumptions: Reasonableness of rates of life insurance: Knowledge of assured: Acts of agents: Estoppel.*

1. Plaintiff made an application for a ten-year endowment policy for $50,000, to be paid him in cash at the end of the ten years, or to his named beneficiary in case of his prior death, for a premium of $400 cash at the time of its delivery, and his note for $4,244.68, payable one year thereafter, and a like amount each year thereafter, the money and note being placed in escrow to become the property of the agent when the policy called for should be delivered. Thereafter a policy, which the agent assured plaintiff corresponded with this agreement, confirmed by exhibition of indorsements "Fifty thousand dollars," "Ten-year endowment," was delivered, and, under circumstances of urgency and haste advanced by the agent, the escrow was re-

leased. Within an hour or two plaintiff procured a translation of the quite involved and complicated phraseology of the policy, found it was not the kind applied for, notified the agent of his objection thereto, tendered back the policy, and demanded return of what he had given therefor. Twelve days thereafter plaintiff commenced an action for rescission, a considerable part of the twelve days being covered by at least tentative promises on the part of the agent to attempt to arrange the matter to plaintiff's satisfaction, and at least one letter from the company's general agent inviting delay. It further appeared from the findings that the agent and the company had refused to deliver the policy applied for and insisted that the policy delivered was such as was covered by the application. *Held:*

(1) Plaintiff was entitled to relief from the injury thus caused him and to the re-establishment of the *status quo* disturbed by the fraud.

(2) While that portion of the relief consisting in the mere recovery back of the $400 might be accomplished by a court of law, the *status quo* could not be re-established without the cancellation of the note and immediate prevention of the use thereof, for which the functions of a court of equity alone were adequate.

(3) There was no unreasonable lack of diligence on the part of plaintiff convicting him of negligence or laches.

(4) It was no defense that plaintiff could not repudiate his written application and was bound to receive and pay for a policy in accordance with its terms, since no right to the plaintiff's money and note could be acquired except upon compliance with the terms of the application, and a judgment canceling the note and decreeing a return of the money could not be affected by the consideration that there might exist an independent cause of action against the plaintiff for some amount promised to be paid by the application.

2. In an action to rescind a contract of insurance, a letter written by the general agent of the company declaring that the policy delivered complied with the application does not establish that the application called for a policy of the kind delivered. Such letter is inadmissible, and, even if admitted, is incompetent, for it is merely a self-serving declaration made out of court.

3. In an action to rescind a contract of life insurance because the policy was not such as met the calls of the application, no presumption exists that an ordinary citizen is chargeable either with knowledge of statistics or capacity to make computations which would inform him that a policy contracted for could not

be sold him at the price agreed upon without rebate or dis-
crimination in his favor.

4. In an action to rescind a contract of life insurance because the
policy was not such as the calls of the application demanded,
the company, while it claims the fruits of the agent's acts, can-
not repudiate his authority to perform them, and hence in such
case it is not necessary to consider the scope of the authority
of such agent.

APPEAL from a judgment of the circuit court for Wood
county: CHAS. M. WEBB, Circuit Judge. *Affirmed.*

About March 16, 1906, plaintiff was approached by de-
fendant *Johnston,* special agent for the defendant insurance
company, with reference to life insurance.  Plaintiff de-
clared his wish for a ten-year endowment policy, was dissat-
isfied with the price demanded by *Johnston,* who promised to
make further investigation as to rates, and appointed a meet-
ing for Sunday, March 18th.  At that time certain rates
were named, with some indefiniteness as to the first year's
premium, and *Johnston* wrote out an application, which
plaintiff signed, but the contents of which is not in evidence.
On March 20th they reached an agreement whereby, as
plaintiff claims and the trial court finds, he was to have a
ten-year endowment policy for $50,000, to be paid him in
cash at the end of the ten years, or to the beneficiary named
in case of his prior death, for a premium of $400 in cash at
the time of its delivery, and his note, payable one year there-
after, for $4,244.68, and a like amount annually thereafter.
They went to plaintiff's bank in order that, as *Johnston* de-
manded, the cash part of the premium and the note for the
first year's premium should be delivered in escrow, and there
they declared their agreement to the cashier of the bank,
whereby it was provided that $400 of money and a
$4,244.68 promissory note, then delivered by the plaintiff to
the cashier, were to become the property of the defendant
*Johnston* upon delivery to plaintiff of a policy which provided
for $50,000 to be paid in cash to plaintiff at the end of ten

years, or to the beneficiary in case of his prior death, which *Johnston* stated was properly designated as a "$50,000 ten-year endowment;" the note to remain in possession of the bank for defendant until its maturity a year later. On April 16th *Johnston* again appeared with what purported to be a $50,000 ten-year endowment policy of life insurance and delivered the same to the plaintiff. The circumstances of such delivery are in dispute, but, as found by the court, consisted in an assurance by *Johnston* that it corresponded with their agreement, confirmed by exhibition of the indorsement, "Fifty thousand dollars," "Ten-year endowment," and of certain prominent lines in the policy suggesting that idea, accompanied by urgent insistence that plaintiff forego submission of the policy to any one for examination, as *Johnston* was in great haste and wanted to catch a train; whereupon the plaintiff gave *Johnston* $400, and went with him to the bank and acknowledged receipt of the policy in compliance with the escrow contract, and the bank gave *Johnston* an acknowledgment that it held the note for delivery to him at the end of the year. *Johnston* went away and immediately remitted to the company $350 of the $400 cash payment. After *Johnston's* departure the cashier suggested to the plaintiff that he ought to have some one familiar with insurance look at his policy, whereupon plaintiff brought it to the cashier, who found it ambiguous, but apparently not in accordance with the terms above stated, and advised him to submit it to a lawyer, which he did. He, after studying its peculiar terms and ambiguities, reached the conclusion that, instead of providing for $50,000 to be paid at the end of ten years, or at plaintiff's prior death, it provided only for a payment of $37,000 in such events, under the guise of providing for payment of $50,000 in fifteen annual instalments of $2,000 each, and in a gross payment of $20,000 at the end of fifteen years after the expiration of the ten-year term, as its terms in fact were. Plaintiff immediately hunted up

*Johnston,* notified him that the policy was not as agreed upon, demanded return of the $400, and tendered delivery of the policy. *Johnston's* attitude is involved in conflict of evidence, but he appears to have at first contended that the policy was such as the plaintiff claimed he was to receive, and, upon being confronted with its language, to have reluctantly admitted the contrary and promised to secure a satisfactory policy within a week. Plaintiff wrote the general office, reiterating his dissatisfaction with the policy, and insisting that either they give him one in accordance with his agreement or give him back his money, which defendant company refused to do, and on May 28th this action was brought seeking rescission of the transaction and return to plaintiff of his $400 and of the note deposited in the bank, which, by the way, *Johnston* had almost immediately attempted to negotiate upon the strength of the bank's written receipt therefor. The court found substantially the facts above stated, that the contract accompanying the deposit with the bank was as the plaintiff claimed, that his receipt of the policy and payment over of the money was induced by fraud of the defendant *Johnston* and was without negligence on plaintiff's part, and that he had been duly diligent in ascertaining the discrepancy and in seeking to reject the policy which had been tendered to him, and accordingly rendered judgment declaring the note in the hands of the bank null and void, and ordering cancellation and delivery thereof to the plaintiff, and enjoining the bank from delivering it to *Johnston* or the defendant company, and for recovery of the $400 from *Johnston* and the company, and directing delivery up and cancellation of the policy of insurance, from which judgment the defendant *Johnston* and the insurance company bring this appeal.

For the appellants there was a brief by *Winkler, Flanders, Bottum & Fawsett,* and oral argument by *F. C. Winkler.*

For the respondent there was a brief by *Goggins & Brazeau,* and oral argument by *B. R. Goggins.*

Dodge, J.   The only possible right of the defendants to the $400 of money and the $4,244.68 note deposited with the bank on March 20, 1906, arose from the agreement made on that day.   That agreement, as found by the court, was for delivery of a ten-year endowment policy for $50,000 without qualification or mental reservation, namely, a policy which should provide for the payment of that amount of money at the end of ten years or upon plaintiff's death. ` Such finding is not only without antagonism by any clear preponderance of evidence, but supported by such proof as to leave it almost without doubt.   That defendants have refused to deliver such policy and have insisted and do insist upon the delivery of a different one is undisputed.   That upon the delivery of such other policy they induced plaintiff to deliver over the $400 and consent to the issue of a binding receipt by the bank declaring the note to be held absolutely for *Johnston,* by means of misrepresentation that the papers delivered complied with the terms of the contract made on March 20th, accompanied by such circumstances of urgency and haste and of misleading written or printed indorsements upon and prominent headlines in the policy as to absolve plaintiff from negligence in crediting and relying upon said representations, is also found by the court, and, as we conclude from the examination of the record, upon abundant evidence.   From such facts the conclusion of law that the plaintiff is entitled to relief from the injury thus caused him and to the re-establishment of the *status quo* disturbed by such fraud is elementary.   *Bostwick v. Mut. L. Ins. Co.* 116 Wis. 392, 89 N. W. 538, 92 N. W. 246; *Urwan v. N. W. Nat. L. Ins. Co.* 125 Wis. 349, 103 N. W. 1102; *Johnson v. Swanke,* 128 Wis. 68, 107 N. W. 481; 2 Pom. Eq. Jur. (3d ed.) § 872.   While that portion of the relief consisting in the mere recovery back of the $400 might be accomplished by a court of law, that would not re-establish the *status quo* without the cancellation of the note and immediate preven-

tion of the use thereof, for which the functions of a court of equity alone are adequate. *Johnson v. Swanke, supra.*

To avert this conclusion it is urged that plaintiff was guilty of negligence and laches in not sooner discovering that the papers he had received were not the policy to which he was entitled and promptly rejecting the same and seeking rescission, under authority of such cases in this court as *Bostwick v. Mut. L. Ins. Co.* 116 Wis. 392, 89 N. W. 538, 92 N. W. 246. We are not fully informed as to appellants' idea of diligence, but, it having been established that the papers passed into plaintiff's possession as the policy to which he was entitled without negligence on his part, we can discover no unreasonable lack of diligence when we remember that within an hour or two thereafter he procured a translation of the quite involved and complicated phraseology of the policy and notified the defendant's agent of his objections thereto, tendered back the policy, and demanded return of that which he had given therefor. No case has been cited to us in any wise suggesting that such conduct could support inference of negligence, laches, or ratification, and the finding of the court that none was established must be sustained. True, it is argued that he did not commence suit for rescission until twelve days later, to wit, April 28, 1906; but there is no showing that in this very brief interval the defendants have suffered any change of position. They had been fully notified of the election of the plaintiff to rescind the transaction and to insist upon a return of that which they had received from him unless they were willing to deliver such policy as required by the agreement under which they had so acquired his property. Further than this, it must be borne in mind that a considerable part of this twelve days was covered by at least tentative promises on the part of *Johnston* to attempt to arrange the matter to plaintiff's satisfaction, and by at least one letter from the company's general agent inviting delay.

Strenuous insistence is made by appellants that plaintiff could not repudiate his written application made on Sunday, March 18th, and is bound to receive and pay for a policy in accordance with the terms thereof. Without passing upon the finding of the trial court that such application was induced by fraud and therefore of no binding force, we can see no relevancy of the contention thus made to the situation here presented. Whether or not plaintiff might be bound to accept and pay for a policy in accordance with the application, the defendants acquired no rights to the property deposited with the bank except upon compliance with the terms of the agreement accompanying such deposit, and the judgment canceling the note so deposited and decreeing a return of the money could not be affected by the consideration that the defendants might have an independent cause of action against the plaintiff for some amount promised to be paid by that application. Possibly that written application, made two days before, might have had some evidentiary relevancy as to the disputed terms of the deposit agreement made March 20th, but for the purpose of this case all such considerations are unimportant, because there is no proof of the contents of that written application. Defendants did not see fit to offer it in evidence, and the trial court expressly declares that it has in no wise been considered by him, although there seems to have been present upon the trial what purported to be a copy of it. Counsel somewhat ingeniously contend that it is at least established that the application called for a policy of the kind delivered by a letter written to plaintiff by the general agent of the company declaring that the policy did so comply. This letter was offered for no such purpose, and, if it had been, would of course have been wholly inadmissible and, even if admitted, incompetent as evidence, for it was a mere self-serving declaration made by the defendants out of court. Further, it was promptly met by plaintiff's denial of such assertion through his attorney.

Further contention is made that plaintiff can have no

standing in a court of equity even to demand back that of which he has been defrauded, because he must have known that a policy such as he contracted for could not be sold to him at the price agreed upon without rebate or discrimination in his favor. We cannot discover any evidence sufficiently cogent to override the finding negativing any knowledge or understanding on his part that either rebate or discrimination would exist. Plaintiff was a retail dry goods merchant, of foreign birth, imperfectly familiar with the English language, and with no English school education. While it may perhaps appear that in the opinion of actuaries, skilled in the peculiar statistics and computations of life insurance, the rates charged would not have enabled a contract by the company to pay $50,000 at the end of ten years or upon the earlier death of the assured, we cannot hold as a presumption of law that the ordinary citizen is chargeable either with knowledge of such statistics or capacity to make such computations. He does not know the rates of interest obtainable by insurance companies. He may read in his daily papers of fabulous rates paid upon the money markets in New York, accompanied by suggestions that the vast accumulations of cash by the life insurance companies have been used to obtain such rates or to gain large profits from underwriting stock or bond issues. Indeed, the defendants themselves offered evidence that in the experience of many years a policy such as that delivered, for which the rates were confessedly regular and sufficient, would, and therefore this policy might be expected to, yield a sum of $50,000 in money at the end of ten years. We are not prepared to say that the ordinary member of the community, unfamiliar with the finance and internal management of life insurance companies, must be charged with the duty of knowing the fairness and the reasonableness of the rates which he pays, when he merely asks and obtains prices from an ostensible expert for the insurance policy which he desires to buy.

Some contention is made that the company is not bound

by the promises or representations made by *Johnston* because not within his authority. We need not consider the general scope of the authority of such an agent, for in the present case all claims of the company and all its rights adversely affected by the judgment are the results of *Johnston's* acts. The company cannot claim the fruits of an agent's acts and repudiate his authority to perform them. *Morse v. Ryan,* 26 Wis. 356; *Fraser v. Ætna L. Ins. Co.* 114 Wis. 510, 517, 90 N. W. 476.

We find no other contentions on the part of appellants which do not either carry their refutation on their face or have been inferentially met and considered in what has preceded, to justify further discussion. We are persuaded that to the extent of the relief granted the judgment is fully warranted by findings which have sufficient support in the evidence.

*By the Court.*—Judgment affirmed.