12939

WELLS v. INTER-OCEAN CASUALTY CO.

(154 S. E., 98)

*Messrs. Lee & Moise,* for appellant,

*Messrs. Epps & Levy,* for respondent,

June 24, 1930.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action by the plaintiff, Phyllis Wells, against the defendant, Inter-Ocean Casualty Company, was commenced in the Court of Common Pleas for Sumter County, February 27, 1929, for recovery of the amount of an insurance policy,

issued by the defendant upon the life of Mittie Green, mother of the plaintiff, under which policy the plaintiff was named as the beneficiary. Issues being joined, the case was tried before his Honor, Judge John S. Wilson, and a jury at the July, 1929, term of said Court, and resulted in a verdict for the plaintiff for the sum of $514.55, the full amount of the policy with interest. From the entry of judgment on the verdict the defendant has appealed to this Court.

Taking up the questions presented by appellant's exceptions, we will first consider the allegation of error imputed to the trial Judge in refusing to grant defendant's motion for direction of a verdict, based upon the ground that the plaintiff, as beneficiary under the policy, had made material and false representations in the application for insurance on which the policy in question was issued, and in the refusal to grant defendant's motion for a new trial based upon the ground that the plaintiff, as beneficiary under the policy, had made material and false representations in the application for insurance on which the policy in question was issued and in the refusal to grant defendant's motion for a new trial based on the same ground. The defendant relies on the following provision of its policy:

"The insurance under this policy shall not cover any person under the age of one year nor over the age of sixty-five years. Any premium paid to the company for any period not covered by the policy will be returned upon request."

In this connection the defendant contends that the insured was between eighty and ninety years old and not an insurable risk, and that the plaintiff, as the beneficiary under the policy, by her material and false representations in the application for the insurance misled the defendant and in this way caused the defendant to issue the policy. In support of its position appellant lays emphasis upon the testimony of its agent, T. C. Robinson, who on direct examination, on this phase of the case, testified as follows:

"I am the agent that wrote this policy on the life of Mittie Green. I first saw Phyllis Wells in Pinewood. We were

working from place to place and happened to hit on her up there at her mother's home. She was outside of the house in the yard or on the steps. I asked her about some insurance. She said she had some but would like to have some on her mother. Mr. Payne was with me.

"Q. Where was the mother sitting at that time? A. Sitting up in the house.

"Q. On the outside or on the inside? A. Inside.

"Q. Did you go up in the house? A. No, sir.

"Q. You were on the ground? A. Yes, sir; on the ground.

"Q. When you said Phyllis said she would like to have insurance on her mother, could you see her sitting up in the house? A. Yes, sir.

"Q. What did you tell Phyllis? A. I told her she looked to be a little too old, and passed on.

"Q. Could you tell what age she was at that time? A. No, sir.

"Q. You judged that she was too old? A. Yes, sir.

"Q. How long did you stay there? A. A minute or so.

"Q. When you left there and went on off, did you see Phyllis Wells any more that day? A. No, sir.

"Q. When was the next time you saw her? A. About two weeks after that.

"Q. Where did you see her? A. Down here at her home.

"Q. Where, what place? A. I don't know; somewhere down here.

"Q. In Sumter? A. Yes, sir.

"Q. Did you go to see her or happened to see her? A. Happened to see her.

"Q. What happened? A. She was out in the yard at her home. I was on the outside on the sidewalk, and she stopped me, then I went in.

"Q. What did she say? A. Said she wanted me to write this insurance for her on her mother.

"Q. What did you say? A. I said, 'Your mother is too old,' she said 'She is not but 56 years old.' I told her if she was certain, I would write the insurance.

"Q. If she had been over 65 years old— A. I told her anybody over 65 I didn't write.

"The Court: When was this insurance written?

"Mr. Moise: The 29th day of December, 1928.

"The Court: Go ahead.

"Mr. Moise: That is the date of the application.

"The Court: Yes.

"Q. Well, what did she say in reference to her mother's age? A. She said she was 56 years old.

"Q. What did she say with reference to her own age? A. Forty.

"Q. At that time did you write it down on an application? A. Yes, sir."

The testimony of the agent, Mr. G. W. Payne, who was with Mr. Robinson, testified to the same effect.

The application was not signed by the insured, neither was it signed by the plaintiff, the beneficiary, but the agent of the defendant who filled out the application signed the name of the insured to the application. The beneficiary, according to the testimony, could neither read nor write, and she denied that she told defendant's agent that her mother was only fifty-six years old. The following testimony of the plaintiff, the beneficiary, is pertinent to this question:

"I am the plaintiff in this case and am the daughter of Mittie Green. She lived at Pinewood, S. C., and had a policy of insurance with the Inter-Ocean Casualty Company. The agent first came to see my mother at Pinewood at her house. I was present.

"Q. State what took place. A. He said, 'Let me take a policy on you,' and 'had already joined one and couldn't take any more,' and he said, 'Let me take one on your mother,' and I said, 'All right,' and he said, 'Who would pay for it,' and I said, 'I would, but I would have to go to

Sumter and get the money,' and he said, 'I will meet you in Sumter, Saturday,' and he met me in Sumter at my daughter's house on Cleveland Street.

"I paid premiums of $2.50 and he gave me the policy. After the policy was delivered my mother was killed by a train at Pinewood. The policy was paid up at the time she was killed on the 14th of January, 1929. The company has never paid the $500.00.

"Q. At the time of the taking out of the policy, you say you were present, the agent was present and your mother was present, the insured; is that correct? A. Yes, sir.

"Q. When the agent was present there in Pinewood, before he came to you to collect the $2.50 premiums, did he or not talk with your mother about the policy? A. Yes, sir.

"Q. Did he talk to you? A. Yes, sir.

"Q. Can you read or write? A. No, sir; neither read or write.

"Q. Ever been to school at all? A. No, sir."

On cross examination of the plaintiff, she further testified in this connection as follows:

"Mr. Robinson was the agent who came to see about taking out the insurance. He came to my mother's house at Pinewood, where I was visiting.

"Q. Your mother was inside the room? A. No, sir; she was on the steps, too.

"Q. Sitting down there by you? A. Yes, sir.

"Q. He came up there and asked you if you wanted to take out some insurance? A. Yes, sir.

"Q. You told him you didn't want any, but you would take out some on your mother? A. Yes, sir.

"Q. He asked you how old your mother was? A. Yes, sir.

"Q. What did you tell him? A. I told him I didn't know, to look at her for himself.

"Q. Your mother, as a matter of fact, was between eighty and ninety years old, wasn't she? A. I don't know.

"Q. How old are you? A. I don't know, sir.

"Q. Are you married? A. Yes, sir.

"Q. Got any children? A. Yes, sir.

"Q. How many? A. I got six head.

"Q. All grown? A. Yes, sir; all about grown.

"Q. You are about fifty or sixty years old yourself, aren't you? A. I don't know sir; I might be; I don't know my age."

The plaintiff further testified to the effect that her mother could get around pretty well and do lots of work; that she was not blind nor deaf, as contended by defendant; that she was killed by train, about "dusk dark," according to her information; that the agent told her at Pinewood, when the first conversation took place and when he saw the insured, that he did not know whether he would be able to get a policy for her or not on account of her age, but that he would try; that at the time there were two agents present, "one said he believed he could get her in the policy; had different classes of policies, one for young people, some for old people, some for middle aged, some for young people, and he said he would look it up and see"; and that the agents went away and soon afterwards delivered the policy to her, at which time she paid the premium. Other inferences might be drawn from other parts of her testimony.

This testimony, as well as additional testimony bearing on this phase of the case, clearly shows that a question for the jury was presented, and his Honor, the trial Judge, committed no error in refusing defendant's motion for direction of a verdict upon the ground stated. For the same reason his Honor cannot be charged with error in refusing defendant's motion for a new trial.

A further allegation of error imputed to the trial Judge is in submitting to the jury the question of waiver, it being the contention of the appellant that there was no inference to be drawn from the testimony that the defendant, or its agents, had waived any of the provisions of the policy, but that, on the contrary, it conclusively appeared that the defendants, in issuing the policy in ques-

tion, had relied entirely upon the statements made by the plaintiff in the application for insurance. The testimony shows that the plaintiff did not sign the application for the insurance, and that she could not read or write. Further, if the testimony of the plaintiff is to be believed, and that was a matter entirely for the jury, the plaintiff made no representation to the defendant's agents as to the age of the insured, but told the agents that she did not know the age of the insured, and, further, that the agents of the defendant saw the insured at the time the agents had the first conversation with the plaintiff; that at the time of the said conversation with the agents the plaintiff and the insured were sitting on the steps together. According to this testimony the agents of the defendants had ample opportunity to observe the insured and determine for themselves her age. We think it was clearly the duty of the presiding Judge to submit to the jury the issue of waiver.

The only other question raised by the exceptions is that the presiding Judge erred in refusing defendant's motion "for a directed verdict on the ground that the plaintiff had, for valuable consideration, executed a valid and binding release, which was a complete bar and defense to the action, and that his Honor should not have submitted the question of fraud in procuring the release to the jury. * * * " It is the contention of the appellant that there was no testimony tending to prove that the release was procured by fraud. The appellant also contends that it was in error in refusing a motion to grant a new trial based on the same ground.

In response to the allegations of the complaint, as to the defendant having procured from the plaintiff through fraud a release of her claim under the policy, the plaintiff testified as follows:

"Q. After your mother's death, did the agent of the company call to see you about the policy? A. How is that?

"Q. After your mother was killed by the train, did the

agent come to see you on Cleveland Street, to see you about the policy? A. Yes, sir.

"Q. What did he say to you? A. He say if I didn't take the money what I paid to put her in the insurance, I wouldn't get the other money.

"Q. Did he ask you for the policy? A. Yes, sir; he asked me for the policy.

"Q. Did you give it to him? A. Yes, sir.

"Q. What did you sign for him, if anything? A. He said he wanted me to sign that. I don't know what he wanted me to sign.

"Q. How much money did he give you? A. $5.26.

"Q. Did you give him a receipt for that? A. Yes, sir.

"Q. When you gave him a receipt, what did he tell you? A. He said if I didn't take that, I wouldn't get no more, said my mother was not entitled to that, because she was deaf and blind, said if I didn't take what I pay in, I wouldn't get no more.

"Q. On the representations made you by the agent of the company, did you give him back the policy? A. Yes, sir; I give him back the policy when he come after it.

"Q. Now, auntie, this paper you signed for the insurance company, did you sign it by mark or how? A. I touched the pen; he wrote it.

"Q. Did you know what was in the paper? A. No, sir; he asked me if I could read or write, I said no, and he said, 'come touch the pen,' and two more men come out of the car and witnessed it; I didn't know who they were.

"Q. Two more men witnessed your mark? A. Yes, sir."

The defendant offered testimony tending to show that the release was procured in good faith; that the plaintiff was not imposed upon but understood what she was doing when she signed the release. The record shows that plaintiff through her attorneys promptly sent to the defendant company and tendered to it the sum of $5.26 paid to the plaintiff by the agents of the defendant when the plaintiff signed the alleged

release, which tender the defendant refused. As we view the record it is our opinion that, under the rule that in passing upon such question the testimony must be considered in the most favorable light for the plaintiff, the presiding Judge properly submitted the question to the jury. Further the matter of granting a new trial based on the same ground was a matter for the determination of his Honor, it appearing in the first instance that the question was one properly for the jury. Under our view of the case his Honor, the trial Judge, committed no error in refusing a motion for a new trial.

The exceptions are overruled, and the judgment affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE COTHRAN (dissenting) : This is an action upon a policy of insurance covering the death from accident, in the amount of $500, on the life of Mittie Green. The plaintiff, Phyllis Wells, was the procurer of, and the beneficiary named in the policy. The defendant company denied liability upon the grounds: (1) That the insured was not an insurable risk; (2) that the beneficiary had made false statements in answer to material questions in the application; and (3) that after the death of the insured the beneficiary had executed a full and complete release of all liability on the part of the company under the policy.

The undisputed facts of the case are these:

1. The policy provides that the insurance shall not cover any person over the age of 65 years.

2. The insured, mother of the plaintiff, was an aged colored woman, born in slavery, and during that period a maid at least 14 years of age, and necessarily at the time of the issuance of the policy, 1929, at least 80 years of age.

3. The application for insurance stated that insured was 56 years of age.

4. The insured was killed by being run over by a train, on a clear day and at a point from which an approaching train could be seen many yards away.

5. After the death of the insured, the beneficiary accepted payment of the premiums which had been paid by her and executed a release for all liability of the company to her under the policy.

If these facts appeared beyond controversy, and the natural inferences to be drawn from them unremoved, there could not be a question but that the defendant's motion for a directed verdict should have been granted.

Upon the face of the case it is conceded that insured was between 80 and 90 years of age; and it must be conceded that under the express terms of the policy it did not cover the life of a person whose age exceeded 65 years.

*Prima facie,* therefore, the policy was of no force in the particular case. What has made it of force under the circumstances?

I cannot conceive of any other basis for the claim that is even debatable, than that the conduct of the agent who solicited the insurance, wrote the application, and delivered the policy amounted to evidence of a waiver, of the condition in the policy that the insured must have been of, or under, the age of 65 years.

The theory of counsel for the plaintiff, as I interpret their argument, is that the insured, at the time that the agent made his first visit to her home, was sitting on the front steps by the side of her daughter, the beneficiary, and that he had ample opportunity to confirm what he then declared, *that she was too old;* that he knew at that time that she was over 65 years, and later drew up the application which fixed her age at 56, in order to insure the passing of the application by the company and the issuance of the policy, that he might obtain the commissions to which he would ordinarily be entitled.

If that be true, I think that it is clear that the action of the agent was a fraud upon the rights of the insurance company, for his own personal advantage, and cannot have the

effect of changing the written contract which contained the disqualifying condition.

The evidence shows that even if the beneficiary was in-nocent in the representation in the application that the in-sured was only 56 years old, the agent was not; he stated that from his observation of the insured she was *too old;* yet notwithstanding this he inserted in the application the statement that she was only 56, an age which was within the terms of the policy and upon reading which he knew that the company would pass the application. He also knew that if he had inserted the correct age or his impressions that she was too old, the application would not be passed.

The beneficiary testified that when the agent returned to her home for the purpose of completing the application, he asked her some questions, the answers to which he put down on a piece of paper (evidently the application form), and read them over to her; *that they were just as she had told him.* She is therefore connected directly with the fraud of the agent.

The question in this case is not whether the policy has been forfeited by the misrepresentations of the insured or beneficiary, but whether under the facts it ever became effec-tive, the insured being beyond the age limited by the policy. If as a matter of fact the insured was 80 years old when the policy was issued, it never became effective. There could not be *a forfeiture* of rights which never existed, and it is impossible, in the nature of things, that the company may have *waived itself into a contract.* Waiver is the voluntary relinquishment of a known right; which naturally presumes the existence of a contract.

In *Layton v. Ins. Co.,* 55 Cal. App., 202, 202 P., 958, it was held that when one holds a life policy, referring in apt terms to the warranties and representations contained in the application annexed, for the reasonable time, he is conclu-sively presumed to know the contents of the contract, and any untruthful answer, plainly written in the application by

the agent or medical examiner, through mistake, negligence, or fraud, and is estopped to assert that he had no knowledge of the untruthful answer.

It has been decided in perhaps 100 cases that where the applicant makes a true representation of a fact which materially affects the contract and the agent in writing the application falsely represents the fact, the insurer cannot object upon the ground that there has been a misrepresentation and claim a forfeiture of the policy. In this case, however, the applicant stated that she did not know the age of her mother; that the agent saw her and could judge for himself. The beneficiary was a woman with six living children, the youngest of whom was of age; the oldest must have been at least 31; and if she had been only 16 when the first child was born she must have been nearly 50 when the policy was issued and her mother more than 65. It is conceded that she was between 80 and 90.

In *Ins. Co. v. Main,* 140 Md., 220, 117 A., 571, 572, it was held that the insurer of an automobile is not estopped to interpose as a defense to an action on the policy, a false statement that the automobile was not mortgaged, which statement was made out by an agent, when assured knew of the false statement, or could have known of it by reading the policy.

In *Ins. Co. v. Richbourg* (Tex. Com. App.) 257 S. W., 1089, it was held that when false statements and representations, which are warranted to be true, were written into an application by the agent, and the applicant knew or had means of knowing that such statements were untrue, insurer is not precluded from avoiding policy conditioned on such false representations.

In the case of *Ryan v. Ins. Co.,* 41 Conn., 168, 19 Am. Rep., 490, certain answers to material questions in the application were falsely and fraudulently entered by the agent, although correct answers were suggested by the applicant.

The Court held that the company was not concluded by the false and fraudulent answers, saying:

"Upon the trial the plaintiff offered to prove, not that the above answers were true, but that different answers were in fact given, both by herself and the insured, and that the answers were wrongfully written by the local agent of the defendants without the knowledge or consent of the plaintiff or her husband. Aside from the claim that the defendants are responsible for the conduct of their local agent, this is merely an attempt to substitute for a part of the written contract declared on, a different parol contract; for the representations and warranties of the plaintiff contained in the written agreement, oral representations and warranties of an entirely different character. It requires no argument to show that this cannot be done. * * * In this case we are asked to go further than any case has yet gone, and clothe the agent with an authority not given him in fact, and to hold the principal responsible for an act which could not by any possibility have been contemplated as being within the scope of the agency. * * * But it cannot be supposed that these defendants intended to clothe this agent with authority to perpetrate a fraud upon themselves. That he deliberately intended to defraud them is manifest. He well knew that if correct answers were given no policy would issue. Prompted by some motive he sought to obtain a policy by means of false answers. His duty required him not only to write the answers truly as given by the applicant, but also to communicate to his principal any other fact material to the risk which might come to his knowledge from any other source. His conduct, in this case, was a gross violation of duty, in fraud of his principal, and in the interest of the other party. To hold the principal responsible for his acts, and assist in the consummation of the fraud, would be monstrous injustice. When an agent is apparently acting for his principal, but is really acting for himself, or third persons, and against his principal, there is no agency in respect to

that transaction, at least as between the agent himself or the person for whom he is really acting and the principal."

The *Ryan case* is extensively quoted from and approved by the Supreme Court of the United States in the case of *Ins. Co. v. Fletcher*, 117 U. S., 519, 6 S. Ct., 837, 841, 29 L. Ed., 934, involving a similar question. The facts appear from the following quotation from that case:

"It is conceded that the statements and representations contained in the answers, as written, of the assured to the questions propounded to him in his application, respecting his past and present health, were material to the risk to be assumed by the company, and that the insurance was made upon the faith of them, and upon his agreement accompanying them that, if they were false in any respect, the policy to be issued upon them should be void. It is sought to meet and overcome the force of this conceded fact by proof that he never made the statements and representations to which his name is signed; that he truthfully answered those questions; that false answers, written by an agent of the company, were inserted in place of those actually given, and were forwarded with the application to the home office; and it is contended that, such proof being made, the plaintiff is not estopped from recovering. But on the assumption that the fact as to the answers was as stated, and that no further obligation rested upon the assured in connection with the policy, it is not easy to perceive how the company can be precluded from setting up their falsity, or how any rights upon the policy ever accrued to him. It is, of course, not necessary to argue that the agent had no authority from the company to falsify the answers, or that the assured could acquire no right by virtue of his falsified answers. Both he and the company were deceived by the fraudulent conduct of the agent. The assured was placed in the position of making false representations in order to secure a valuable contract, which, upon a truthful report of his condition, could not have been obtained. By them the company was imposed up-

on and induced to enter into the contract. In such a case, assuming that both parties acted in good faith, justice would require that the contract be canceled and the premiums returned. As the present action is not for such a cancellation, the only recovery which the plaintiff could properly have upon the facts he asserts, taken in connection with the limitation upon the powers of the agent, is for the amount of the premiums paid, and to that only would he be entitled by virtue of the statute of Missouri."

The Court proceeds:

"But the case as presented by the record is by no means as favorable to him as we have assumed. It was his duty to read the application he signed. He knew that upon it the policy would be issued, if issued at all. It would introduce great uncertainty in all business transactions if a party making written proposals for a contract, with representations to induce its execution, should be allowed to show, after it had been obtained, that he did not know the contents of his proposals, and to enforce it notwithstanding their falsity as to matters essential to its obligation and validity. Contracts could not be made, or business fairly conducted, if such a rule should prevail; and there is no reason why it should be applied merely to contracts of insurance. There is nothing in their nature which distinguishes them in this particular from others. But here the right is asserted to prove, not only that the assured did not make the statements contained in his answers, but that he never read the application, and to recover upon a contract obtained by representations admitted to be false, just as though they were true. *  *  *  A curious result is the outcome of the instruction. If the agents committed no fraud, the plaintiff cannot recover, for the answers reported are not true; but if they did commit the imputed fraud he may recover, although, upon the answers actually given, if truly reported, no policy would have issued. Such anomalous conclusions cannot be maintained."

The application made a part of the policy contained also the following provision:

"That the agents and solicitors of the company are not authorized to extend credit or waive or modify any of the terms or conditions hereof."

In the case of *Ins. Co. v. Main, supra,* the Court quoting an array of authorities observes:

"If it be objected that there is no contention in the case at bar that the erroneous answer in warranty No. 3 was fraudulently written by the agent of the company, but that only negligence is charged, it is sufficient to call attention to the fact that it nowhere appears in the record that the assured was ignorant of the answer written by the agent, and the presumption is that, even if he did not know it at the time it was written, he knew it after he accepted the policy. He does not even claim that he did not know of the erroneous answer. If he knew it then, it was a fraud upon his part not to disclose the error to the agent or to the company, and the cases cited are therefore applicable."

Even if the false statement as to the age of the insured was a ground of forfeiture of the policy and not a ground for holding that the insured being over the age of 65 years was never covered by the policy at all, it seems clear from the case of *Assurance Company v. Building Association,* 183 U. S., 308, 22 S. Ct., 133, 46 L. Ed., 213, that the company is not estopped from relying upon this defense. In that case the syllabus is as follows:

"It is competent and reasonable for insurance companies to make it matter of condition in their policies that their agents shall not be deemed to have authority to alter or contradict the express terms of the policies as executed and delivered."

In the opinion in the case last referred to the Court quotes at length from the case of *Ins. Co. v. Wolff,* 95 U. S., 326, 24 L. Ed., 387:

"But, even if the agent knew the fact of residence within the excepted period, he could not waive the forfeiture thus incurred without authority from the company. The

policy declared that he was not authorized to waive forfeiture; and to that provision effect must be given, except so far as the subsequent acts of the company permitted it to be disregarded. There is no evidence that the company in any way, directly or indirectly, sanctioned a disregard of the provision with respect to any forfeitures, except such as occurred from non-payment of premiums."

The Court in the *Building Association case* quotes extensively from the case of *Ins. Co. v. Fletcher,* 117 U. S., 519, 6 S. Ct., 837, 29 L. Ed., 934, in which it was held:

"The company, like any other principal, could limit the authority of its agents, and thus bind all parties dealing with them with knowledge of the limitation. It must be presumed that he read the application, and was cognizant of the limitations therein expressed."

The Court concludes with a lengthy dissertation which fully sustains the extract from the syllabus above quoted.

In *Norwich Co. v. Kobacker* (C. C. A.), 31 F. (2d), 411, quoting syllabus, it is held:

"Insured must be charged with knowledge of provisions of burglary policy, without regard to whether it was read, or by whom answers to questions were supplied, where policy provided that statements and answers to such questions were warranted by assured to be true."

In *Mutual Life Ins. Co. v. Lambert* (D. C.), 34 F. (2d), 215, quoting syllabus, it is held:

"Where application for life policy required that all questions be answered by insured, that insured ratify representations therein and statement to medical examiner, and that no agent had power to bind company by making promises or accepting representations or information not contained in application, and where insured signed statements and certificate as to their correctness, insurance company had right to cancel policy for falsity of answers contained in application, though truthful answers were made to soliciting agent and medical examiner, and such agents had knowledge

of falsity of answers contained in written application, since the provisions of the contract were competent and binding on the parties."

In *Adler v. Ins. Co.* (C. C. A.), 33 F. (2d), 827, quoting syllabus, it is held:

"Insurance agent's knowledge of facts omitted by insured from answers to questions in application for life policy is not knowledge of principal, when agent knows of and participates in actual fraud being perpetrated on principal."

In *Maier v. Ins. Co.* (C. C. A.), 78 F., 566, quoting syllabus, it was held:

"The F. Ins. Co. issued a policy on the life of M., which was recited on its face to be issued in consideration of the application, which was made a part of the policy, and a copy of which was thereto attached, and to be subject to the conditions thereon indorsed, one of which was that, if any statement in the application was false, the policy should be null and void. The application concluded with a provision that all statements contained in it, by whomsoever written, were warranted to be true, and that no verbal statement, to whomsoever made, should modify the contract. Upon the trial of an action on the policy, it appeared that M. made the application at the solicitation of an agent of the insurance company; that such agent had a short conversation with him when he was in a hurry, and, after answering a few questions, he told the agent to finish the application himself, and he would sign it and leave it to the agent to finish, which the agent did; that the answers to questions in the application as to M.'s health and his habits of drinking were totally at variance with the facts, which were such as, if known, to make the acceptance of M.'s application very unlikely. Held, that the insurance company was not estopped to deny the validity of the policy, and a verdict in its favor was properly directed by the Court."

In *Forwood v. Ins.*, 117 Md., 254, 83 A., 169, quoting syllabus, it was held:

"Where answers in an insurance application must have been known to the applicant to be false, and the application was annexed to and made a part of the policy, and contained a declaration that the statements and answers were true, there could be no recovery, although true answers were given by the applicant and different answers copied in the application through the mistake or fraud of the agent, since he could have discovered this fact, and by failing to disclose it to the company he participated in the fraud or mistake."

See, also, *Bostwick v. Ins. Co.*, 116 Wis., 392, 89 N. W., 538, 92 N. W., 246, 67 L. R. A., 705 and extensive note thereto.

In the case of *Mutual Life Ins. Co. v. Hilton-Green*, 241 U. S., 613, 36 S. Ct., 676, 680, 60 L. Ed., 1202, the Court said:

"The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith, and not as a shield for unfair dealing. *Distilled Spirits*, 11 Wall., 356, 367, 20 L. Ed., 167, 171; *American Surety Co. v. Pauly*, 170 U. S., 133, 156, 18 S. Ct., 552, 42 L. Ed., 977, 985; *American Nat. Bank v. Miller*, 229 U. S., 517, 521, 522, 33 S. Ct., 883, 57 L. Ed., 1310, 1312, 1313; Mechem, Agency, 2d Ed., § 1815.   *   *   *

"The assured at the least consciously permitted an application containing material misrepresentations to be presented by subordinate agents to officers of the insurance company under circumstances which he knew negatived any probability that the actual facts would be revealed; and later he accepted policies which he must have understood were issued in re-

liance upon statements both false and material. He could claim nothing because of such information in the keeping of unfaithful subordinates. Moreover, the false representations accompanied and were essential parts of the policies finally accepted. He did not repudiate, and therefore adopted and approved, the representations upon which they were based. Beyond doubt an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties. *New York Life Ins. Co. v. Fletcher,* 117 U. S., 519, 529, 533, 534, 6 S. Ct., 837, 29 L. Ed., 934, 939, 940; *Assurance Co. v. Building Association,* 183 U. S., 308, 361, 22 S. Ct., 133, 46 L. Ed., 213, 234; *United States Life Ins. Co. v. Smith,* 92 F., 503, 34 C. C. A., 506."

The evidence of fraud in obtaining the release from the beneficiary is exceedingly weak, but probably is sufficient to have required a submission of that issue to the jury.

For these reasons I think the Court below should have held that under the plain terms of the policy the insurance did not cover the life of a person between 80 and 90 years of age, and that the company was not estopped from relying upon this defense notwithstanding the fraudulent conduct of the agent, and that the defendant's motion for a directed verdict should have been granted.